663 P.2d 270

IDAHO STATE TAX COMMISSION,
Petitioner,

v.

Bill STAKER, Canyon County Auditor;
Richard Pence, Twin Falls County Audi-
tor; Marie Ivie Lilya, Blaine County Au-
ditor; Margaret F. Clements, Gooding
County Auditor; Elaine S. Johnson, Car-
ibou County Auditor; and Ronald Long-
more, Bonneville County Auditor; The
Honorable Douglas D. Kramer; The
Honorable Jim R. Doolittle; The Honor-
able Robert G. Newhouse; and the Hon-
orable Francis J. Rasmussen, Respon-
dents.

No. 14740.

Supreme Court of Idaho.

Oct. 29, 1982.

Dissenting Opinion Nov. 5, 1982.

David H. Leroy, Atty. Gen., Theodore V.
Spangler, David G. High, Deputy Attys.
Gen., Boise, for petitioner.

William A. Morrow, Caldwell, Harry C.
DeHaan, VI, Twin Falls, Ray Keith Roark,
Hailey, Douglas F. Rose, Shoshone, Clyde G.
Nelson, Soda Springs, Lynn E. Thomas,
Boise, Michael Arnold Henderson, Hailey,
Richard N. Gariepy, Ketchum, William J.
Brauner, Caldwell, for respondents.

Charles F. McDevitt and Kenneth L. Mal-
lea, of Givens, McDevitt, Pursley & Webb,
Boise, for amicus curiae Associated Taxpay-
ers.

PER CURIAM.

This matter is before the court on the
petition and amended petition for alterna-
tive writ of mandamus by the Idaho State
Tax Commission.

The action was originally instituted against the auditors of six counties and ultimately amended to incorporate as respondents district judges sitting in four of the respective counties.

Upon receipt of the petitions, this court directed the respondents to file responses and supporting briefs, and attorneys representing all parties, including amicus curiae, the Associated Taxpayers of Idaho, made oral presentations before the court relative to their respective positions.

Original jurisdiction of this court is invoked pursuant to Title 1, Chapter 2 of the Idaho Code and the matter has proceeded pursuant to I.C. § 7–301 et seq. and I.A.R. 43.

There are primarily three central issues raised in this proceeding:

1. Whether the State Tax Commission is empowered and authorized to equalize the assessments of property in all the counties of the state of Idaho, and has the State Tax Commission in this case exercised that power and authority in accordance with the statutes of the State of Idaho and the constitution of the United States and the State of Idaho.

2. Whether the acts requested by the State Tax Commission of the county auditors are ministerial acts subject to enforcement by writ of mandamus.

3. May the respondents contest the tax commission's actions in a judicial proceeding, and if so, what is the standard of review of the tax commission's action?

The circumstances which bring the foregoing issues to this court may be summarized as follows. Pursuant to I.C. § 63–605, the Idaho State Tax Commission, sitting as a State Board of Equalization, convened in the first week of August, 1982, to review the assessments of property throughout the state by various categories, as said assessments were performed by the various county assessors. The Board, using various data supplied to it, determined that the property of seven counties as to several categories of property was being assessed at a rate markedly below the average state level and therefore entered its directive to the respec-

tive county auditors requiring that the county auditors enter upon the real property assessment rolls of their respective counties certain adjustments to accomplish equalization. The auditor of Boundary County complied but the auditors of six other counties have not complied, either on the basis of their individual decisions not to do so, request by the county commissioners, or in obedience to the temporary restraining orders and preliminary injunctions issued by the respondent district judges which prohibited their compliance. This action proceeds with respect to the counties of Canyon, Twin Falls, Blaine, Gooding, and Caribou. Bonneville has been removed from the case by stipulation.

Regarding Issue No. 1, we think it is clear, and counsel for some of the respondents acknowledge in the hearing before this court, that the tax commission is constitutionally and statutorily empowered and authorized to equalize the assessments of property among the various counties of the State of Idaho. Idaho Const. Art. 7 § 12. I.C. § 63–513. *Ada County v. Bottolfsen,* 61 Idaho 363, 102 P.2d 287 (1940); *Northwest Light Co. v. Alexander,* 29 Idaho 557, 160 P. 1106 (1916). From the record, we also conclude that the tax commission procedurally followed the statutes of the State of Idaho in directing the respondent auditors to make the equalization adjustments which are the subject of this litigation, and that those procedures do not violate the due process provisions of either the fifth amendment of the United States Constitution or the due process clause of the state constitution.

With regard to the second issue, we also conclude that it is clear from our prior cases and cases from other jurisdictions that the mandate of I.C. § 63–614 which requires that:

"As soon as the county auditor receives the certified statements [the certified statement from the State Tax Commission showing changes in the assessments] ... he shall enter in the columns in which the items to be corrected appear

upon the real property assessment roll, in red ink, all changes and corrections made by the state tax commission in the assessment . . . ,"

imposes a "purely ministerial" duty upon the county auditor and that if he refuses to carry out that duty a writ of mandamus will lie to compel his performance of that ministerial duty. *People v. Hively,* 139 Colo. 49, 336 P.2d 721 (1959); *State Tax Commission v. Johnson,* 75 Idaho 105, 269 P.2d 1080 (1954).

The third issue raises a more difficult question concerning whether or not the respondents in this action can judicially contest the tax commission's order, and if so what standard of review is applicable.

In *Utah Oil Refining Co. v. Hendrix,* 72 Idaho 407, 411, 242 P.2d 124 (1952), this court had under consideration an action where a taxpayer sought and received a writ of mandate from this court compelling the officials of Ada County to comply with an order of the State Tax Commission. In issuing the writ this court stated:

"... the order of the Tax Commission is immune to collateral attack to the same extent as judicial decisions ..."

Similarly, the Supreme Court of Colorado, in *People v. Hively,* 139 Colo. 49, 336 P.2d 721 (1959), considering a mandamus action by Colorado's tax commission against a county assessor requiring the county assessor to make additions and corrections in the assessment roll of the county involved, commented as follows:

"... Essentially, this is a jurisdictional conflict between officers of the county and of the state...."

The court, in *Hively,* then, after rejecting the procedural and constitutional arguments raised by the assessor and after holding that the acts requested of the assessor were "purely ministerial" summarized its holding as follows at 336 P.2d 735:

"Thus the Assessor here had no more standing to question the validity of the action of the Board than a lower court has to question the validity of the mandate of a reviewing court. He was obligated to carry out the mandate of the

Board. There is *no* legal justification for his defiance and the district court lacked jurisdiction to hear the case. It follows that writs of mandamus and prohibition are here appropriate."

Similarly, as in Colorado, the Idaho State Tax Commission is empowered, authorized and directed to equalize the assessments of property of all counties throughout the state. The tax commission is a constitutionally established body pursuant to Article 7 § 12 of the constitution, which provides that the tax commission shall have "such other powers and perform such other duties as may be prescribed by law, including the supervision and coordination of the work of the several county boards of equalization." The legislature, pursuant to the constitutional mandate, has empowered and directed the tax commission to equalize the assessments throughout the state through the provisions of Chapter 6, Title 63 of the Idaho Code. Accordingly, the action of the State Tax Commission, involved herein, is not only authorized, but mandated.

The respondent county auditors assert that the proper forum for determining the issues involved in this action, are actions before the district courts pursuant to I.C. § 63–202A. A reading of the entire Chapter 6 of Title 63 makes it clear that I.C. § 63–202A involves the assessment function of a county official as distinguished from the equalization process by the State Tax Commission at issue here.

While the legislature in I.C. § 63–3811 has made specific provision for appeal by taxpayers or county assessors to the Board of Tax Appeals from determination of ad valorem taxes made pursuant to I.C. § 63–401 (county commission meeting as a board of equalization), I.C. § 63–2210 (appeals from county board of equalization), I.C. § 63–3049 (income tax assessments) and I.C. § 63–3632 (sales tax assessments), the legislature has made no provision for an appeal to be taken from the decision of the tax commission in equalizing assessments made pursuant to I.C. § 63–605, et seq. Therefore, it is apparent that the legislature did not contemplate that the action of

the State Tax Commission in equalizing assessments would be subject to review by either the district courts or by the Board of Tax Appeals. This court largely determined the central issue of this appeal in its 1891 decision of *Orr v. State Board of Equalization*, 3 Idaho 190, 194, 28 P. 416, referring to the State Board of Equalization, whose powers now are conferred upon the State Tax Commission pursuant to S.L. 1945, ch. 69,

> "There is no method of appeal pointed out by statute to secure review of the action of said board. The writ of *certiorari* is the proper and only means of bringing such action before this court for review."

As this court stated in *Ada County v. Bottolfsen*, 61 Idaho 363, 372, 102 P.2d 287 (1940),

> " 'The State Board of Equalization is a constitutional board, clothed by statutory authority with quasi-judicial powers in regard to the assessment of certain classes and kinds of property. It is given the power exclusively, and it is required, to value and assess the properties of public utilities. It has the right to exercise a fair discretion in expressing its judgment as to the valuation of such property, and when it has once acted, and there is no fraud shown in its judgment, its action is not subject to review.' (*Northwest Light, etc. Co. v. Alexander*, 29 Idaho 557, 566, 160 P. 1106)"

Courts from other jurisdictions have noted that if a tax commission or its equivalent, acting as a state board of equalization, acts in bad faith or so arbitrarily as to amount to constructive fraud, its actions may be subject to judicial review in an extraordinary proceeding.

In *Panhandle Eastern Pipe Line Co. v. Dwyer*, 207 Kan. 417, 485 P.2d 149 (1971) *cert. den.* 406 U.S. 967, 92 S.Ct. 2409, 32 L.Ed.2d 665, the Kansas Supreme Court articulated the proper scope of judicial inquiry into state equalization matters as follows:

> "[I]t has always been the rule of this court that matters of taxation, especially assessments, are administrative in their character and should remain free of judicial interference in the absence of fraud, corruption or conduct so oppressive, arbitrary or capricious as to amount to fraud. (*Harshberger v. Board of County Commissioners*, 201 Kan. 592, 442 P.2d 5; *Mobil Oil Corp. v. McHenry*, 200 Kan. 211, 436 P.2d 982).

In the early case of *Symns v. Graves*, 65 Kan. 628, 70 P. 591, we stated at page 636, 70 P. at page 594 of the opinion:

> ' . . . Matters of assessment and taxation are administrative in their character, and not judicial; and an interference by judges, who are not elected for that purpose, with the discharge of their duties by those officers who are invested with the sole authority to make and estimate value, is unwarranted by the law. The district court could not substitute its judgment for that of the board of equalization, and this court cannot impose its notion of value upon either. These are fundamental principles in the law of taxation, and cannot be waived aside to meet the exigencies of any particular case . . . .'

Unless there has been fraud, corruption or conduct so oppressive, arbitrary or capricious as to amount to fraud in the assessment, the courts cannot interfere."

Additionally, in *State v. Rella Verde Apts. Inc.*, 25 Ariz.App. 458, 544 P.2d 675, 681 (1976) *cert. den.* 429 U.S. 831, 97 S.Ct. 92, 50 L.Ed.2d 95, the court stated:

> "This brings us to the vital issue in this case, the method used by the Board in arriving at assessed valuations. By what standard does the court judge the action of the Board? In its task of equalizing taxes, the Board was acting in a quasi-judicial capacity. In the very early case of *United Globe Mines v. Gila County*, 12 Ariz. 217, 222, 100 P. 774, 776 (1909), the court stated:

> ' . . . . [T]he court may only inquire into such action for the purpose of ascertaining whether the territorial board of equalization had jurisdiction to make the order, or to determine, when the

issue be raised, *whether the board of equalization acted in bad faith or so arbitrarily as to amount to constructive fraud in adopting its scale of valuation . . . .'*

In the case of *Cochise County v. Southern Pacific Company,* 99 Ariz. 385, 409 P.2d 549 (1966), the Court quoted United Mines with approval and further stated:

'Although the board acted on *incorrect* information, there was no showing that the rate was grossly excessive, or that the action of the board was in fact arbitrary or fraudulent.' (Emphasis added.) 99 Ariz. at 394, 409 P.2d at 555.

. . . .

It is thus the law that the burden placed upon the taxpayer in challenging the equalization system is very heavy, and justly so. Appraising is not an exact science, it is merely an estimate of value. . . . While the Courts can compel boards of equalization and assessors to act, no Court can decide for them what their judgment ought to be." (Emphasis added.)

■ In the present action the respondents have made no allegation that the action of the tax commission was fraudulent, or so arbitrary as to amount to constructive fraud. Respondents simply assert that the tax commission had no constitutional authority to override their valuations, and further they question the validity of the "ratio study" utilized by the tax commission in part in calculating the scope of required equalization. We have concluded that the tax commission does have the constitutional authority to override the counties' valuation, and none of the other allegations presented by the respondents in this case come within the ambit of judicial review as set forth in *Ada County v. Bottolfsen,* 61 Idaho 363, 102 P.2d 287 (1940).[1]

Respondents assert that equalization by the tax commission without opportunity for hearing violates the federal due process requirements.

Respondents further assert that the issuance of a writ of mandate by this court, exercising its original jurisdiction, and thus by-passing the respective district court actions, would effectively deprive the taxpayers of the State of Idaho of due process of law in that it denies them the opportunity to be heard. This issue has been presented in a number of cases throughout the United States, the leading decision being by the U.S. Supreme Court in *Bi-metallic Invest. Co. v. State Bd. of Equalization,* 239 U.S. 441, 36 S.Ct. 141, 60 L.Ed. 372 (1915), in which Mr. Justice Holmes writing for a unanimous court, in an action involving a challenge of a state board of equalization order to the Denver assessor stated:

"For the purposes of decision we assume that the constitutional question is presented in the baldest way,—that neither the plaintiff nor the assessor of Denver, who presents a brief on the plaintiff's side, nor any representative of the city and county, was given an opportunity to be heard, other than such as they may have had by reason of the fact that the time of meeting of the boards is fixed by law . . . .

The question, then, is whether all individuals have a constitutional right to be heard before a matter can be decided in which all are equally concerned,—here, for instance, before a superior board decides that the local taxing officers have adopted a system of undervaluation throughout a county, as notoriously often has been the case . . . .

Where a rule of conduct applies to more than a few people, it is impracticable that everyone should have a direct voice in its adoption. The constitution does not require all public acts to be done in town

---

1. The Tax Commission (although not required to do so) did provide the counties a hearing to present any objections or suggestions relative to the equalization procedure. Some counties declined to participate, others submitted written comments, and some, such as Canyon, participated in extensive evidentiary proceedings, the transcript of which has been supplied to this court. The Tax Commission considered the information before making its certifications.

meeting or an assembly of the whole. General statutes within the state power are passed that affect the person or property of individuals, sometimes to the point of ruin, without giving them a chance to be heard. Their rights are protected in the only way that they can be in a complex society, by their power, immediate or remote, over those who make the rule .... It appears to us that to put the question is to answer it. There must be a limit to individual argument in such matters if government is to go on." Similarly, rulings emanating from the states of Kansas, Nebraska, Maryland, Ohio, and Wyoming have universally held that enforcement of the order of the Tax Commission does not abridge any constitutional right of the taxpayer to be heard.[2]

The court having considered the amended petition, the responses of the county auditors, and the affidavits, briefs, and all arguments supplied by all parties, concludes that a peremptory writ of mandate should lie.

We are mindful of the stringent statutory timetable imposed upon the counties in their assessment, billing, and tax collecting functions. Accordingly, we retain jurisdiction of this action and the parties until December 31, 1982, during which period any party requiring assistance or order of this court in performance of its statutory duties in complying with the peremptory writ of mandate may make appropriate motion.

LET A PEREMPTORY WRIT ISSUE ACCORDINGLY.

BISTLINE, J., does not join in this opinion.

## PEREMPTORY WRIT OF MANDAMUS

WHEREAS, it appears from a verified Petition and Amended Petition presented to this Court and filed in the above entitled proceedings that you have refused to correct and complete the assessment rolls of your respective counties pursuant to certifications of real and personal property rolls made by the Petitioner under and pursuant to § 63–612 Idaho Code,

AND WHEREAS, the Court has reviewed said Petition and Amended Petition and has entered an Opinion on even date herewith, ordering the issuance of a Peremptory Writ of Mandamus to compel you to correct and complete the assessment rolls of your respective counties pursuant to said certifications;

NOW THEREFORE, YOU ARE HEREBY COMMANDED immediately upon the service of this Writ upon you to comply with the provisions of I.C. § 63–614, and correct and complete the assessment rolls of your respective counties as required by said I.C. § 63–614, pursuant to the certifications of property rolls made by the Petitioner, copies of which are attached as exhibits to the affidavit of Paul Adams in support of the Petition herein.

IT IS FURTHER ORDERED that the Petitioner serve true and complete copies of this Peremptory Writ of Mandamus upon the respondent auditors herein, and file a certificate of service or return of service with the Court within five (5) days of receipt of a certified copy of this Writ from the Clerk of the Court.

BISTLINE, Justice, dissenting.

A good beginning point for an analysis of the voluminous record, multiplicity of briefs, and complex issues, is to recognize that four of the State's district judges saw enough substance to the claims of the counties to justify the issuance of writs to the Tax Commission. Six counties believing

2. *State ex rel. Miller v. Dwyer,* 208 Kan. 437, 493 P.2d 1095 (1972) (no notice required); *Hacker v. Howe,* 72 Neb. 385, 101 N.W. 255 (1904) (even if some form of notice was required, the statutory provision fixing the time and place of the meeting of the state board was sufficient notice); *Leser v. Lowenstein,* 129 Md. 244, 98 A. 712 (1916) (statute setting forth the time and place for Tax Commission to meet to conduct its equalization process was sufficient to meet all due process requirements); *Hammond v. Winder,* 100 Ohio 433, 126 N.E. 409 (1919) (acting in the nature of an equalization board, it is not required to give notice in order that its actions shall be valid). See also 24 A.L.R. 331 (1923); 84 A.L.R. 197; *Baker v. Paxton,* 29 Wyo. 500, 215 P. 257 (1923) (no notice required to individual taxpayers).

their local taxpayers to have been aggrieved by the actions of the State Tax Commission have gone to bat for those taxpayers. If the counties involved did not do so, the big question is: from whence in our system of laws and men are the taxpayers afforded any protection? My reading of the Court's opinion is that there is no protection. But Idaho's past history continuing up until today tells me that the Constitution, the Idaho Supreme Court, and the legislature have afforded such protections.

It is important to first isolate in terms of ordinary parlance the nature of the dispute between the counties on the one hand and the Tax Commission on the other. Basic to the controversy is the definition of "full cash value."

"For purposes of assessment and taxation of property in title 63, the terms 'value,' 'cash value,' 'full cash value,' 'true value,' and 'true cash value' shall mean 'market value.'" I.C. § 63–111.

Prior to a 1969 amendment "full cash value" was defined by I.C. § 63–111 as follows:

"By the term 'value,' 'cash value' or 'full cash value' is meant the value at which the property would be taken in payment of a just debt due from a solvent debtor, or the amount the property would sell for at a voluntary sale made in the ordinary course of business, taking into consideration its earning power when put to the same uses to which property similarly situated is applied."

In 1969 the legislature handed to the Tax Commission the defining of market value.

"Rules and regulations pertaining to market value—Duty of assessors.—It shall be *the duty of the state tax commission to prepare and distribute* to each county assessor and each board of county commissioners within the state of Idaho, *rules and regulations prescribing and directing the manner in which market value is to be determined for the purpose of taxation.* The rules and regulations promulgated by the state tax commission shall require each assessor to find market value of all property within his county according to recognized appraisal methods and techniques as set forth by the state tax commission; provided, that the actual and functional use shall be a major consideration when determining market value of commercial and agricultural properties. The state tax commission shall also prepare and distribute from time to time amendments and changes to the rules and regulations as shall be necessary in order to carry out the intent and purposes of this act. The rules and regulations shall be in the form as the commission shall direct, and shall be made available upon request to other public officers and the general public in reasonable quantities without charge. In ascertaining the market value of any item of property, the assessor of each county shall, and hereby is required to, abide by, adhere to and conform with rules and regulations hereinabove required to be promulgated by the state tax commission." I.C. § 63–202. (Emphasis added.)

It is quite clear that the Tax Commission was authorized and required to promulgate rules and regulations for finding market value, and equally clear that market value be determined "according to recognized appraisal methods and techniques." I.C. § 63–202. It is clear, also, that the prior legislative definition, I.C. § 63–111 was given proper consideration by the Tax Commission when it fulfilled its rule and regulation making function. Also self-evident is that the Tax Commission had proper regard for the time-honored methods and techniques for determining fair market value which have always obtained when the State of Idaho (and other entities so empowered) exercise the right of eminent domain.

Thus, the Tax Commission has by rule and regulation defined, for the tax assessors, and presumably for itself, market value and the three generally recognized approaches to determining it. This is readily available in *Tax Commission Ad Valorem Property Tax Regulations,* Vol. III, on file

in the Idaho Law Library, Boise, Idaho.[1] Page 1 of a ten-page rule and regulation captioned Art. 202 last updated December 24, 1980, guides the county assessors (and presumably the Tax Commission as well) as follows:

> MARKET VALUE FOR TAXATION
> REAL PROPERTY VALUATION
> ART. 202
> Page 1 of 10

### REGULATIONS

ART. 202 RULES AND REGULATIONS PERTAINING TO MARKET VALUE

MARKET VALUE:

An open market value concept is "that amount of United States money or its equivalent that in all probability a property would exchange hands for between a willing seller, under no compulsion to sell, and an informed, capable buyer; a reasonable time being allowed to consummate the sale and substantiated by a reasonable down payment or full cash payment."

63–111, I.C. TERMS TO BE CONSTRUED AS MARKET VALUE—For purposes of appraisal, assessment and taxation of property in title 63, Idaho Code, the terms "value," "cash value," "full cash value," "true value," and "true cash value" shall mean "Market value for assessment purposes" as defined by rules and regulations of the State Tax Commission.

This "market value for assessment and taxation purposes," concept shall mean the same as the open market value concept. To achieve equitable property appraisals there can be only one definition of market value.

The first step in the appraisal of any property is the physical inspection, recording and plotting in detail as to size, shape, quantity and quality of the components of the subject property.

The market value for assessment purposes estimated must be entered by the county assessor upon the taxpayer's valuation assessment notice (I.C. 63–212).

The estimate of market value must be based upon procedures, methods and techniques consistent with guidelines recommended by appraisal institutes and appraisal societies of national recognition.

The generally recognized three approaches to value must be kept in mind by the appraiser. The three approaches are the *cost approach, market data (comparison) approach,* and *income approach.*

If the three approaches are not applicable to the property under appraisal, then as many approaches as possible shall be analyzed.

STC Regulation Amended 1980

In the ensuing nine pages the three recognized techniques of appraisal are explained and summarized in language which should be valuable to any assessor and understandable by a neophyte commencing his first term. In short, I see it as well done, and to be commended.

I do not see, however, any mention whatever of a fourth technique of appraisal—"Ratio Study." The Tax Commission in its brief as much as concludes that there has been no promulgation of such a rule or regulation, in making its contention as it does at p. 54, "THAT 'RATIO STUDY' PROCEDURES ARE NOT ADOPTED AS RULES IS NOT A DEFENSE TO THE ISSUANCE OF THE WRIT." From which emphasized statement the brief advances the thought that the promulgation of a rule or regulation was unnecessary. Whether necessary or not is an issue not discussed in the Court's opinion, notwithstanding that counsel involved have recognized and discussed it in the briefs. It was discussed and explained further at oral argument.

On the one hand, at least as I understand it, there are the county assessors at work in their respective counties determining the market value of the real property of their constituents by utilizing the procedures designated by the Tax Commission's Rules and

---

1. The ten-page rule may also be found in Annex A–1 in an Appendix to the brief of the State Tax Commission.

Regulation, Art. 202. Having completed their functions as required, comes then the Tax Commission and increases entire categories by utilization of its Ratio Study Procedure. This, say the county officials, cannot be done. Two reasons are assigned. The first is that the Tax Commission's procedure is beyond the ambit of statutory provisions and in non-compliance with the provisions of the Administrative Procedures Act, in particular those provisions which require the Tax Commission to transmit its promulgated rules to the secretary of the senate and the chief clerk of the house before the first day of the regular session of the legislature next following the promulgation of the rule, and then affords the legislature an opportunity in which to reject or modify the rule. I.C. §§ 67–5217 and –5218. At oral argument it was mentioned that one of the petitioners in the district court actions and hence affected by this Court's disposition is a state senator and a taxpayer of one of the counties involved.

It would be an exercise in futility to engage in a unilateral dissertation on an issue which the Court does not even mention in its opinion. I do venture, however, that I see little merit in the Tax Commission's argument that it can utilize the Ratio Study Procedure in equalizing a given category without having first promulgated a rule or regulation to that effect. A major portion of the Tax Commission's brief is directed at explaining the mechanism of the Ratio Study and a defense of its right to apply that technique as justification for increasing the assessed valuation of a county by category—an issue of fact which the Tax Commission obviously expected this Court to pass upon—which it has not.

The Tax Commission urges these propositions in concluding its brief:

"There are *no limitations* on the sources of information that may be considered in statewide equalization.

"... [T]he legislature intends that *mere irregularity* in exercise of the Tax Commission equalization power should not act to defeat statewide equalization of property ·assessments." Brief, p. 58. (Emphasis added.)

Such broad claims of unbridled power all in the name of statewide uniformity are difficult to accept. Obviously some of the counties do not, and they have claimed in turn that the Tax Commission's "mere irregularity" and its use of a new procedure without benefit of rule is unconstitutional. These are serious charges meriting serious discussion, and in turn analysis and disposition in this Court. For my part, I certainly incline to the belief that those issues should have been met, and I see no obstacles which precluded the Court from doing so.

II.

My reading of Idaho statutory law and Idaho case law brings me to the conclusion that there has never been a time in Idaho history that the Tax Commission or its predecessor had an unbridled authority subject to no judicial restraints.

A good starting point in any controversy is a decision of the United States Supreme Court. Here that decision is the *Bi-Metallic* case, 239 U.S. 441, 36 S.Ct. 141, 60 L.Ed. 372 (1915), quoted in and relied upon in the Court's opinion. I do not in the least doubt the validity of that 1915 opinion—*as applied to those times.* Those times did not include the application of the Administrative Procedure Act, enacted in Idaho in 1965. Those times were not concerned with the same constitution and statutory law which is now the law in Idaho. And the *Bi-Metallic* Court specifically premised its opinion on the assumption *"that the proper state machinery has been used.* 36 S.Ct. at 142. *Bi-Metallic* was not on appeal from an Idaho Supreme Court decision, but from the Supreme Court of Colorado. Of no little significance the Colorado court in its *Bi-Metallic* decision differentiated between what Justice Holmes referred to as "the proper state machinery." That differentiation is practically the whole of the Colorado court's opinion:

"However, as the recent case of *Blomquist et al., Idaho Tax Commission v. Board of Commissioners of Bannock County* (Idaho), 137 Pac. 174, is said to be

in direct conflict with the conclusions reached in *People ex rel. v. Pitcher* [56 Colo. 343, 138 P. 509 (1914)], supra, it is not improper to briefly consider the former case herein, and supplement, by additional argument, our views in the latter case. In doing this, it is essential to keep in mind that the legislative act under consideration in the Idaho case (Idaho S.L.1913, p. 167) has no similarity to the Colorado act under consideration in the *Pitcher* Case, except solely that the two acts designate the agencies therein and thereby created, as the Tax Commission of such states respectively. Moreover, our Constitution in regard to revenue officers is, in substantial respects, unlike the Idaho Constitution in that regard. While section 6 of article 18 of the Idaho Constitution provides for the election, every two years in each of the several counties of the state, of certain county officers, including county assessors, and, in that regard, it is substantially the same as section 8 of article 14 of our Constitution, there is, in the same section of the former, an express prohibition not found in our Constitution against the Legislature creating any other county offices. Of course, if the Legislature can create no other county offices, it is powerless to authorize other officers than those designated in the Constitution to perform any of the functions of a county officer named in the Constitution. Our Constitution creates many offices, the duties of which it does not prescribe, but places no limitation upon the creation of others. 'In judging what it means, we are to keep in mind that it is not the beginning of law for the State, but that it assumes the existence of a well-understood system which is still to remain in force and be administered, but under such limitations and restrictions as that instrument imposes.' Cooley's Const.Lim. (7th Ed.) p. 94." 56 Colo. 512, 138 P. 1010 at 1011 (1914). It is to be noted that Justice Holmes in his *Bi-Metallic* opinion, was careful to point out that in that high court's resolution of the

issue presented to it on the writ of error (appeal) that questions on the Colorado constitution and laws "are matters purely of state law." 36 S.Ct. at 142. The two *Bi-Metallic* opinions of 1914 and 1915 are of little more than passing interest other than that they suggest keeping in mind, firmly in mind, that the case presented to this court last Thursday is to be resolved by deciding whether "the proper state machinery has been used" in regard to which we are informed that the Colorado Constitution and laws of 1914 were not at all similar to the Idaho Constitution and laws of 1915. What is in order is a determination of 1982 issues in light of 1982 statutory law and existing case law. A proper resolution of the issues presented hinges thereon—not on a 1915 case holding *federal* constitutional due process provisions had not been violated.

### III.

I am not able to succumb nor subscribe to the doctrine that the equalization procedures of the Tax Commission are not subject to judicial review. That is not to suggest that a court can substitute its value determination for that of either a county assessor or the Tax Commission. But it is to say that there has always been a limited review, as is also true of the Court's limited review of Public Utilities Commission decisions "to determine whether the commission has regularly pursued its authority, including a determination of whether the order appealed from violates any right of the appellant under the Constitution of the United States or of the state of Idaho." I.C. § 61–629.[2]

In *Orr v. State Board of Equalization*, 3 Idaho 190, 28 P. 416 (1891), the second year of statehood, the Court there noting that no appeal could be taken from Board "action," 3 Idaho at 192, 28 P. 416, found it necessary to determine whether a citizen and taxpayer could "bring this suit for the purpose of determining whether the state board of equalization has, in the matter herein set

2. The Tax Commission statutorily created in 1913 comprised the members who also comprised the Public Utilities Commission. Only a point of interest.

forth, acted in excess of the jurisdiction conferred upon it by law." 3 Idaho at 193, 28 P. 416. The Court quoted with approval from the California case of *Maxwell v. Board,* 53 Cal. 389, 391 (1879) for the proposition that:

"'When, however, a public board or officer has exceeded the limited powers conferred by law, and the direct consequence of such excessive use of authority must be to add to the burden of local taxation, it clearly appears that, unless the act *ultra vires* be annulled, each taxpayer must suffer injury common in character, but special in amount or degree. It would seem that *one thus directly affected should be entitled to a remedy,* and our conclusion is that the petitioner was authorized to commence his proceeding.'" 3 Idaho at 193–94, 28 P. at 417 (emphasis added).

A factor which undoubtedly influenced the Court in *Orr* is the not insignificant matter of a constitutional protection: "Courts of justice shall be open to every person, and a speedy remedy afforded for every injury of person, property or character, and right and justice shall be administered without sale, denial, delay, or prejudice." Idaho Constitution, Art. 1, sec. 18. The Idaho court went on to state the nature of the case then before it—which many of those interested in the outcome of the case at bar will see as strikingly similar:

"It is alleged that the state board of equalization, in excess of the jurisdiction conferred on it by law, has reduced the valuation of a certain class of property in said county, and has increased the valuation placed upon other certain classes of property by the local assessor. It is uncertain whether the burden of taxation to the individual taxpayer, not owning cattle or sheep, or a stockholder in a railroad corporation, is greater or less than it would have been had these changes not been made, nor, in our view, is it necessary for the taxpayer or this court to enter into a lengthy mathematical calculation to ascertain this fact. Large reduction has been made in the assessed valuation of railroad property in said

county, and considerable increase has been made in the valuation of cattle and sheep. Whether the aggregate increase of valuation in the county is equal to the aggregate decrease in such valuation, or is greater or less, we are unable to say; but *every citizen and taxpayer of the state has the right to insist that every board or officer having any authority connected with the levy and assessment of taxes shall, in the exercise of his duties, pursue the methods pointed out by the statute."* 3 Idaho at 194, 28 P. at 417–18 (emphasis added).

Noting that the state board of equalization was exercising judicial functions, and there being no method of appeal pointed out in the statutory provisions, 3 Idaho at 194, 28 P. at 418, the Court held that the writ of certiorari (by statute known as the writ of review) is the proper means of seeking relief, in fact the only means. 3 Idaho at 195, 28 P. at 418. *Northwest Light and Water Co. v. Alexander,* 29 Idaho 557, 160 P. 1106 (1916), is a clear affirmation of the *Orr* holding that the Supreme Court may on writ of review examine the actions of the state board of equalization. The alternative writ issued based on proper allegations of the petition, and the record below was certified up. The Court there noted, as have I, its limited review: "[S]hould that record disclose the fact that the board ... did not exceed its jurisdiction in assessing plaintiff's property, we are not permitted to go further." 29 Idaho at 564, 160 P. at 1108. The issue there was simple. It was contended that the state board of equalization could not establish a valuation different from that set by the Public Utilities Commission in exercise of its ratemaking function. Speaking of the authority of the board, the Court noted "its legal right to exercise *a fair discretion* in expressing its judgment of the particular property ...." 29 Idaho at 567, 160 P. 1106 (emphasis added). At p. 570, 160 P. 1106, the Court stated that the board, as with county assessors within their respective counties, is "invested with *certain discretion* involving the exercise of judgment in the performance of

their duties, which is not subject to review." 29 Idaho at 570, 160 P. at 1110 (emphasis added). *A fortiori*, per *Orr*, that discretion is not without limits which will be examined when challenged.

In the matter of procedures which may transgress the "proper state machinery" Justice Knudson as recently[3] as 17 years ago for a unanimous court held that the Tax Commission had erroneously upheld a value arrived at by application of appraising procedures not within the statutory provisions. *Abbot v. State Tax Commission*, 88 Idaho 200, 398 P.2d 221 (1965). What the Court there said is still pertinent notwithstanding some changes since made in the law, and perhaps more so now than then with the enactment of the 1965 Administrative Procedures Act, and subsequent amendments. The Court there was in agreement that the ultimate determining factor in appraising is "*whether the method used by the assessor was legitimate and fair, and was a reasonable method to use in arriving at the value of the property in question.*" 88 Idaho at 206, 398 P.2d at 224 (emphasis added). Legitimate. Fair. Reasonable. This is but an expansion on the language of the earlier courts, perhaps in more definitive language.

The various Idaho cases (time constraints do not allow for discussion of all of them) show that judicial review, limited as just mentioned, has been and is, until today, available in Idaho, and that, substance taking precedence over form, it little matters whether the relief sought by the county officials is called a writ of review, a writ of prohibition, or a writ of mandamus; the relief sought may as likely be in response to a writ proceeding initiated by the Tax Commission. In today's complex controversy, writs were obtained by the counties in the district courts, but there is little doubt that the legal issues determinable there are also determinable here. Issues of fact are not easily triable here, as is at once demonstrated on observing the appendix to the Tax Commission's brief which attempts to explain the use of the Ratio Study technique.[4]

IV.

The Court's opinion declares that the legislature did not contemplate that action of the Tax Commission would be subject to review by the district courts or by the Board of Tax Appeals, and cites *Orr, supra.* The fact that *Orr* held review available in this Court does not to my mind establish that similar review is not obtainable in district courts. The latter, where there are questions of fact, is by far the superior forum. But, is there no right of appeal? The Court's opinion says "no." I am not that certain; perhaps under less precipitate circumstances I might be brought to agree. Presently I am influenced by what I think to be an easy reading of the unambiguous provisions of I.C. § 63–202A[3](2) which specifically applies to, not just the assessment proceedings as the Court sees it, but also to the equalization procedures. The section in question as amended in 1977 begins as follows:

"Whenever it appears to the state tax commission that any public officer or employee *whose duties relate to the* assessment or *equalization of assessments of property* for taxation has failed to comply with any law relating to such duties, or the rules of the state tax commission made in pursuance thereof, the state tax commission, after a hearing on the facts, may issue its order directing the public officer or employee to comply with such law or rule. (An order of the state tax commission may require a county to conduct a revaluation of some or all of the property within the county as the tax commission may find necessary to promote uniformity of taxation within the county." (Emphasis added.)

Being made somewhat uncertain of either my powers of reading, or of comprehension, or both, by the Court's statement to the contrary, I nevertheless, for now at least, persist in reading the foregoing as being applicable to those cases where a county

---

3. Three members of that court, though retired, are alive and well today.

4. A sampling of pages are appended.

official fails (which may be a refusal) to comply with the statutory law or the rules of the State Tax Commission.

I further see that provision as calling for a hearing, and unless one reads into that sentence the words "ex parte" or "star chamber" it would seem inescapable that there should be a hearing at which the county officials are allowed to be heard—although the Court's opinion says there is not such a requirement.

The legislature, anticipating that county officials believing themselves possessed of a valid reason for not complying with an invalid commission rule or regulation, saw a need for a procedure by which to obtain enforcement of its order—giving the Tax Commission a set of teeth, as it were. Hence, I.C. § 63–202A[4](3) provides for resort to district court:

> "If such public officer or employee, for a period of ten (10) days after service on him of state tax commission's order, neglects or refuses to comply therewith, the state tax commission *may apply to a judge of the district court of the county in which the public officer holds office for an order,* returnable within five (5) days from the date thereof, to compel such public officer or employee to comply with such law or rule, or to show cause why he should not be compelled so to do." (Emphasis added.)

It seems to me that the legislature did thereby provide an orderly scheme for the enforcement of its lawful orders, and at the same time provided *an opportunity for a district court to initially determine the lawfulness of the order* the enforcement of which can be sought in district court under I.C. § 63–202A. If the order is not unlawful, the district court will obtain compliance with a contempt order—which is far the better and more accepted manner of procedure than coming to this Court for an extraordinary writ. I.C. § 63–202A is a well thought out scheme which affords protection to everyone, lays disputes before local district courts, and provides for an appeal—thereby obviating resort to petitioning for writs in order to resolve disputes between

the local level of government and state level. That there will be a district court order, and that there is a right of appeal is not open to question:

> "Any order issued by the judge pursuant thereto shall be final; provided, however, that any person aggrieved by such order may appeal to the supreme court of the state of Idaho in the manner provided for appeals in other civil actions. An appeal as provided for herein shall not state[*] any order issued by any judge pursuant hereto pending such appeal." I.C. § 63–202A[5](4).

*This is a transcriptional error in the Code. The word is "stay." *See* S.L.1977, p. 734.

An aggrieved person is understood as meaning any party to the district court proceeding who receives an adverse ruling. The Supreme Court, in hearing an appeal, would have the benefit of the district court transcript of proceedings and the findings of fact and conclusions of law of the district judge—of inestimable benefit, and a benefit we do not have in this case.

The question which automatically presents itself is what happens where the Tax Commission does not go to district court, and there is no hearing, and no order adjudicating the dispute? Logically, so I believe, the parties aggrieved by the Tax Commission's failure to comply with the procedural directions of the statute are entitled to initiate the action in district court which the Tax Commission should have initiated. A proper method is the writ process, and that is what the various counties here have been doing, and apparently believed to be the appropriate procedure by the various district judges who issued alternative writs. In a way it is analogous to what we all know as "inverse condemnation." If the party who is supposed to bring you into district court does not do so, you bring him into court. It is not a difficult concept. I do not see it in any way as a "collateral attack" to use the courts to enforce the requirement that "proper state machinery" be used, when to not use it is to deny procedural due process. This is general law, and it has been the case law in

Idaho. A review under a writ, where necessary, or an appeal where I.C. § 63–202A is followed, is a proper examination for denial of due process. I repeat that I do not see that review by petition or by appeal gives the courts any right to interfere with a fair discretion in the exercise of *proper* recognized appraisal techniques and approaches which have set out by rule and regulation of the Tax Commission, and then gone unchallenged by the legislature after the same have been properly presented to it as required under the Administrative Procedures Act.

Although the Court's opinion seems to largely hinge on the assertion that "respondents have made no allegation that the action of the Tax Commission was fraudulent, or so arbitrary as to amount to constructive fraud," my concern is not with the technicality of pleadings, but rather the greater concern with respondents' contention that they have been denied procedural due process. In my book denial of procedural due process is per se arbitrary, and is per se constructively fraudulent. The holdings and statements of the Arizona and Kansas courts [5] are not inapposite to my views or the views expressed by this Court in earlier cases, and as recently as 1965 in the *Abbot* case by an esteemed court. Courts cannot become assessors, but when the day comes that the courts are not open

5. *People v. Hively,* 139 Colo. 49, 336 P.2d 721 (Colo.1959), is perhaps deserving of more study and discussion than given it in the Court's opinion. A 17-page opinion, it contains considerably more than the two quotes taken from it found in the Court's opinion. It is first to be noted that the Colorado court in *Hively* largely reviews, relies upon, and quotes extensively from its own 1914 cases, *Bi-Metallic,* 138 P. 1010 (1914), and *People v. Pitcher,* 56 Colo. 343, 138 P. 509 (1914). I have already pointed out that the United States Supreme Court in *Bi-Metallic, supra,* indulged, as it said it must, in the assumption "that the proper state machinery has been used." I have set forth from Colorado's *Bi-Metallic* the passage wherein that court distinguished Colorado's "proper state machinery" from Idaho's.

I additionally note that the longer passage in the Court's opinion, taken from *Hively,* 336 P.2d at 735, was a mere adherence to another early day Colorado case, *People v. Pitcher,* 156 P. 812 (1916), which in turn was based upon the 1915 *Pitcher* case decided the same year as *Bi-Metallic.* If the "proper state machinery" of Colorado was in 1915 not the same as "the proper state machinery" in Idaho, as the *Bi-Metallic* Colorado court tells us, considering the vast changes in our statutory law, including but not limited to the application of the Administrative Procedures Act, it is not likely that the *Hively* case, based as it is on 1915 *Pitcher,* 1915 *Bi-Metallic,* and 1916 *Pitcher,* should be very persuasive. In *Hively,* 336 P.2d at 736, there is the quotation from the 1916 *Pitcher* case reciting that the district court there held that the state board of equalization had jurisdiction, meaning, as I understand it, that it had not acted in excess of or beyond its jurisdiction, and that was or should have been the end of the inquiry. The *Hively* court *did* consider the alleged irregularities, beginning 336 P.2d at p. 735, on the part of the board, but found them basisless in light of the 1916 *Pitcher* case. The following passage illustrates indeed well the vast differences between Idaho's "proper state machinery" and Colorado's:

"'However, should we finally hold that, where the law requires that a board of equalization act upon specific evidence, no other action may be permitted, the rule is in no wise applicable to the case at bar. Our Constitution is silent in regard to the evidence or character thereof essential to valid action upon the part of the state board of equalization in the performance of its duties. It may, therefore, resort to any source of information it may desire in reaching its conclusions, even though it be assumed that it may not reach its conclusions from its own knowledge. Indeed, the majority of this court, speaking thru Mr. Justice Hill, has heretofore held that where the fundamental law creates an agency and invests it with power, without prescribing the manner in which it may be exercised, the agency is at liberty to adopt its own mode of procedure. *People ex rel. Moore v. Perkins,* 56 Colo. 17, 42, 43, 44, 137 P. 55, Ann.Cas. 1914D, 1154.'" Quoting from *People v. Pitcher,* 61 Colo. at 177, 156 P. at 821.

Unlike Colorado, the Idaho Constitution creating the state board of equalization declared that its "duties . . . shall be prescribed by law." Originally adopted Art. 7, sec. 12. The 1944 amendment created in its place the State Tax Commission. As to its duties, Art. 7, sec. 12 now reads:

"The duties heretofore imposed upon the state board of equalization by the Constitution and laws of this state shall be performed by the state tax commission and said commission shall have such other powers and perform such other duties as may be prescribed by law, including the supervision and coordination of the work of the several county boards of equalization . . . ."

to insure the guarantee of that which is known as due process, that will not be a happy day.

## APPENDIX

## OPENING PAGES OF APPENDIX TO TAX COMMISSION BRIEF

### INTRODUCTION

Annual studies of the ratio between the market value determined by verified sales prices and appraisals of real property and the assessed value of the same real property as stated on county assessors' roll are conducted in compliance with Idaho Code, Section 63–513. Information from these studies is used to provide technical assistance to counties, to test the results of the continuing appraisal process, and to assist the State Tax Commission in its task of equalizing and certifying county abstracts of valuation.

The purpose of this appendix is to explain in detail the procedures involved in ratio studies. Areas that will be discussed include the following:

1. Definitions
2. Sampling procedure, including sales verification process
3. Development of Tax Commission appraisals
4. Types of studies
5. Statistical analysis of data
6. Mass Appraisal Standards
7. Equalization procedures

### 1. DEFINITIONS

A. Assessed value [see market value for assessment purposes (MVAP)].

B. Bona fide sale means a normal transaction consummated between a willing buyer and willing seller, neither acting under duress.

C. Market value for assessment purposes (MVAP) means the current level of value estimated by a qualified appraiser following the guidelines in Tax Commission Rules and Regulations Article 202 and Section 63–923, Idaho Code. Also see Article III, Ad Valorem Property Tax Regulations of the State Tax Commission (here in after "Regulations"). See Annex A.

D. Parcel means an area of real estate with or without improvements thereon, held as one unit under a single ownership.

E. Ratio means the percentage relationship between the assessor's MVAP and the Tax Commission's market value, for all taxable real property in each county for a "ratio study year".

F. Ratio study year means that year in which the results of a particular study are submitted to the Department of Education. Sales used in a study will normally be those occurring during the fiscal year immediately preceding the ratio study year, i.e., 1984 ratio study year sales will be those consummated between July 1, 1982 and June 30, 1983 (fiscal year 1983).

G. Real property means current categories numbered 1 through 5 and 11 through 46, pursuant to Article 605 Regulations. See Annex B.

H. Sale/appraisal ratio means the percentage relationship between the assessor's MVAP and the verified sales price or appraisal made by Tax Commission personnel computed as follows:

$$\text{Sale/Appraisal ratio} = \frac{\text{Assessor's MVAP}}{\text{Selling price or appraised value}} \times 100$$

I. Sample means verified sales or appraisals made specifically for the ratio study program.

### STATISTICAL DEFINITIONS

All terms are defined in accordance with their usage in this ratio study program.

('E') as used in these definitions, refers to 'the sum of' any particular values.

1. *Arithmetic Mean (average) ($\bar{x}$):*
The result of dividing the sum of ratios or other numbers in a series by n, the number of samples or values in the series. A measure of central value in a series.

Simple to compute, but may be disproportionately influenced by extreme values.

$$\bar{x} = \frac{Ex}{n}$$

2. *Array:* An ordered series: from low to high or high to low.

3. *Determination, Coefficient of (r²):*

A statistic designed to indicate how accurately an average line of best fit matches the data used to develop that line. At $r^2 = 0$, the points or values in the series used are completely random and do not at all fit into a line, while $r^2 = 1$ indicates a perfect fit of all points along a line.

$$r^2 = \frac{[E(x-\bar{x})(y-\bar{y})]^2}{[E(x-\bar{x})^2][E(y-\bar{y})^2]}$$

where x = a given variable in one group of data with $\bar{x}$ as its mean;

and y = a given variable in a separate group of data with $\bar{y}$ as its mean.

(see: Line of Best Fit)

4. *Dispersion, Coefficient of:*

A measure of how closely together in relation to the median the samples in an arrayed group lie. Specifically, the percent spread from the median of the middle 50% of samples.

$$\text{Coef. of Disp.} = \frac{.5(Q_3-Q_1)}{\widetilde{x}}$$

where $Q_3$ = that point representing the 3rd quartile (75th percentile) in an array,

and $Q_1$ = that point representing the 1st quartile (25th percentile) in an array,

and $\widetilde{x}$ = the median.

(see: Quartile and Median)

5. *Dispersion, Coefficient of (Intra-Area):*

A measure of how close all arrayed samples are to the median. Used in Federal guidelines, this measure is calculated by summing the absolute value (disregarding signs) of the difference between each ratio and the median ratio and then dividing this sum by the median ratio. The result is expressed as a percentage.

$$\text{CIAD} = \frac{E1x-\widetilde{x}1}{\widetilde{x}} \times 100$$

Where CIAD is the Coefficient of Intra-Area Dispersion,

x is the value of any given ratio, and

$\widetilde{x}$ is the value of the median ratio.

6. *Distribution,* t:

A statistic used to estimate the degree of accuracy of the sample mean for small samples. It is calculated by dividing the standard error of the mean into the difference between the sample mean and whatever population mean against which the test is to be made. This test tells us the probability that, even though the sample mean is known, the population mean is something different. After calculating t, a scale, similar to that used in the z test, is consulted.

$$t = \frac{\bar{x} - m}{s/\sqrt{n}}$$

Where $\bar{x}$ = sample mean

m = population mean

s = sample standard deviation

n = sample size (less than or equal to 30)

(same as $s/\sqrt{n}$ )

7. *Distribution,* z:

A scale which enables measurement of the probability of occurrence of a sample ratio or population mean ratio that is significantly different from the sample mean. This scale is similar to the t-distribution, except that it is to be used only when the sample size is greater than 30. The calculated z value itself tells the number of standard deviations away from the mean any particular test mean or sample lies. Probability is then calculated from a table. (See t distribution.)

8. *Frequency distribution:*

An arrangement of statistical data that shows how often given values or value groups occur.

(see: Histogram)

9. *Geometric Mean:*

A measure of central value determined by multiplying all of the values in a series together and then taking the "n"th root of this product.

$$\text{geo. mean} = \sqrt[n]{x_1 \cdot x_2 \cdot x_3 \cdots x_n}$$

where $x_1$, etc., represent each value in the series; and n = the number of values in the series.

10. *Histogram:*

A pictorial representation of a frequency distribution enabling comparison to a standard curve.

(see: Frequency Distribution)

11. *Line of Best Fit (Regression Line):*

A line representing the average relationship between two variables. This line is determined from the assessor's declared ratio of assessment as one variable and the ratio as determined from the ratio study as the other variable. Depending on the closeness of fit ($r^2$), it may be possible to predict probable true ratios using hypothetical and declared ratios.

For the standard line

$$y = A \div Bx$$

where $y$ = the true ratio of assessment,

$x$ = the declared ratio,

$A$ = the y-intercept of the line and is calculated from the formula:

$$A = \frac{EyEx^2 - ExExy}{nEx^2 - (Ex)^2}$$

and $B$ = the slope of the line and is calculated from the formula:

$$B = \frac{nExy - ExEy}{nEx^2 - (Ex)^2}$$

(see: Determination, Coefficient of)

12. *Mean:* (see: Arithmetic Mean)

13. *Median ($\tilde{x}$):*

The middle value or point in an array. A measure of central tendency found by $\tilde{x}$ .5n + .5, where n = the number of values (samples, etc.). Also, equivalent to the 50th percentile.

(see: Dispersion, Coefficient of)

Quartile (Q):

That value below which one quarter of an arrayed sample will lie.
Used in determining coefficient of dispersion.

$Q_1$ = .25n + .25 = 1st Quartile = 25th percentile.

(median) $Q_2$ = .5n + .5 = 2nd Quartile = 50th percentile.

$Q_3$ = .75n + .75 = 3rd Quartile = 75th percentile.

(see: Dispersion, Coefficient of)

15. *Regression Index:*

This statistic is designed to indicate the treatment of property in relation to high or low value. Tendencies to value high priced property disproportionately with regard to low priced property, or vice versa, can be identified.

To calculate this index, a sales weighted average ratio is first determined by dividing the sum of the county assessor's assessed value for all samples by the sum of the sales determined market value for all samples. This quotient is then divided into the unweighted mean ratio, with the result being the regression index.

16. *Standard Deviation(s):*

A statistical measure of the spread or distance of sample ratios from the mean in a sample group.

$$s = \sqrt{\frac{E(x-\bar{x})^2}{n-1}}$$

where $x$ = the value ratio of each individual sample,

$\bar{x}$ = the arithmetic mean,

and $n$ = the number of samples in the group.

17. *Standard Error of the Mean:*

A statistic that indicates the probable magnitude of difference between a result obtained from a sample and the actual result if measured for a population as a whole.

$$SE_{\bar{x}} = \frac{s}{\sqrt{n}} \div \bar{x}$$

where $SE_{\bar{x}}$ = standard error of the mean ($\bar{x}$),

$s$ = standard deviation,

and $n$ = number of samples

(see: Standard Deviation)

18. *Variation, Coefficient of:*

A measure of the spread of sample ratios from the mean expressed as a percent of the mean.

$$\text{Coef. of Var.} = \frac{s}{\bar{x}} \times 100$$

where $s$ = standard deviation

and $\bar{x}$ = the arithmetic mean.

(see: Standard Deviation)

## 2: RATIO STUDY SAMPLING PROCEDURE

In order to obtain meaningful results from a ratio study, it is necessary that each category of property studied in each county have adequate representation from the samples chosen for the study. In particular, samples must be well distributed geographically and economically, and there must be a sufficient quantity of these samples to develop a true cross section of county property.

The Tax Commission shall acquire all available sales data in each county. An adequate number of appraisals will be produced by staff appraisers and will be included in the ratio study. Gathering and confirmation of the data used in the ratio study shall be done by a qualified appraiser or statistician. In all counties, the primary source of sales information will be the deed records of the county. All sales which meet the requirements of a free market transaction between a willing buyer and a willing seller, and which are not to be excluded as invalid sales as indicated below shall be included in the ratio study. Validity of sales data used in the ratio study shall be made by confirming the details of each transaction. Confirmation may be made by contact in person or by mail with either the grantee, the grantor, or other authorized person who is fully informed of the terms of the transaction. Sales may also be confirmed by thorough review of authenticated documents. If confirmation is by mail, a cover letter and sales verification questionnaire will be used. Samples of these documents are provided in Annex E & F.

Information shall be recorded on the commission approved ratio data record. See Annex G.