682 P.2d 539

**William and Gretchen HELLAR, husband and wife; Bingo Si John; and Coeur D'Alene, Idaho, a Municipal Corporation, Plaintiffs-Appellants Cross-Respondents**

**and**

**Samuel A. Rohrer; Douglas E. Long, Benewah County, a Political Subdivision of the State of Idaho; and Post Falls Highway District, Plaintiffs,**

**v.**

**Pete T. CENARRUSA, Secretary of the State of Idaho; Clifford Chapin, in his official capacity as Bonner County Clerk and on behalf of those similarly situated; and State of Idaho, Defendants-Respondents-Cross-Appellants,**

**and**

**John V. Evans, Governor of the State of Idaho, Appellant-Cross Respondent by Intervention.**

No. 15201.

Supreme Court of Idaho.

April 16, 1984.

Raymond C. Givens and W.W. Nixon, Coeur d'Alene, for plaintiffs-appellants cross-respondents Hellar, et al.

Jim Jones, Atty. Gen. and Kenneth R. McClure, Deputy Atty. Gen., Boise, for defendants-respondents-cross-appellants Cenarrusa, et al. and for the House of Representatives of the State of Idaho as intervenors.

Patrick D. Costello, Office of the Governor, Boise, for Governor Evans.

Eugene C. Thomas and Jeffrey A. Strother, Boise, of the firm of Moffatt, Thomas, Barrett and Blanton, Ctd., Sp. Deputy Attys. Gen., Boise, for James E. Risch as President Pro Tem of the Idaho Senate and T.W. Stivers as Speaker of the Idaho House of Representatives, intervenors.

Dennis Milbrath, Boise, for certain Hispanic intervenors.

Gary L. Montgomery, Boise, for certain Ada County Legislators et al., intervenors.

HUNTLEY, Justice.

We have been petitioned, pursuant to our retained jurisdiction in *Hellar v. Cenarrusa*, 106 Idaho 571, 682 P.2d 524 (1984) (*Hellar II*), to rule upon the constitutionality of the legislative reapportionment scheme enacted as H.B. AS 746 in the closing hours of the recent legislative session.

Our decision in *Hellar II* held in pertinent part that "... the 1984 election shall be conducted under [reapportionment] Plan 14–B ... unless the legislature enacts a constitutional alternative reapportionment plan," and that "should an alternative plan be enacted and signed into law, this court may review said plan ... [and] will determine [its] constitutionality...."

The plaintiffs petition this court to declare the scheme of H.B. 746 in violation of the United States Constitution because (1) it has an impermissibly large population deviation (32.94%); and (2) the legislative districts located within three counties are gerrymandered by unnecessarily splitting neighborhoods and rural and urban populations to preserve incumbencies.

## I.

### STANDARD OF REVIEW

In ruling upon the petition before us, we are constrained by two guiding principles:

■ First, the apportionment of the legislature is, in the first instance, a matter of legislative discretion and judgment. The courts will not intervene unless a legislatively enacted plan fails to pass constitutional muster.

■ Second, this court, in determining whether a plan is violative of the United States Constitution, must follow pertinent rulings of the Supreme Court of the United States.

## II.

### EQUAL REPRESENTATION

■ The Equal Protection Clause of the Fourteenth Amendment of the United States Constitution requires that a state, in apportioning its legislature, "make an honest and good faith effort to construct districts ... as nearly of equal population as is practicable." *Reynolds v. Sims*, 377 U.S. 533, 577, 84 S.Ct. 1362, 1389, 12 L.Ed.2d 506 (1964). The legal research before us presented literally dozens of decisions of the United States Supreme Court and other Federal Courts which clearly compel us to declare H.B. 746 unconstitutional because it provides the people of some legislative districts with as much as 32.94% less voting power than the citizens of other districts.

In *Brown v. Thomson*, 462 U.S. 835, 103 S.Ct. 2690, 77 L.Ed.2d 214 (1983), the United States Supreme Court most recently summarized its previous reapportionment holdings with the following statement of the law which we are pledged to follow:

"Our decisions have established, as a general matter, that an apportionment plan with a maximum population deviation under·*10%* falls within this category of minor deviations. See, e.g., *Connor v. Finch,* 431 U.S. 407, 418, 52 L.Ed.2d 465, 97 S.Ct. 1828 [1835] (1977); *White v. Regester,* 412 U.S. 755, 764, 37 L.Ed.2d 314, 93 S.Ct. 2332 [2338] (1973). A plan with larger disparities in population, however, creates a prima facie case of discrimination and therefore must be justified by the State. See *Swann v. Adams,* 385 U.S. 440, 444, 17 L.Ed.2d 501, 87 S.Ct. 569 [572] (1967) ('De minimis deviations are unavoidable, *but variations of 30% among senate districts and 40% among house districts can hardly be deemed de minimis and none of our cases suggests that differences of this magnitude will be accepted, without a satisfactory explanation grounded on acceptable state policy.*') The ultimate inquiry, therefore, is whether the legislature's plan 'may reasonably be said to advance [a] rational state policy' and, if so, 'whether the population disparities among the districts that have resulted from the pursuit of this plan exceed constitutional limits.' *Mahan v. Howell,* 410 U.S. 315, 328, 35 L.Ed.2d 320, 93 S.Ct. 979 [987] (1973). (Emphasis supplied.) As applied to H.B. 746 the conclusion must be that since the population deviation is 32.94% (not "under 10%"), the deviation is not in the "minor" category, but to the contrary, creates a prima facie case of discrimination and must be justified by the state.

The defendants herein argue that the grossly disparate population deviation of H.B. 746 can be justified because of Idaho's terrain, its shape, and its relatively sparce population. That argument ignores the rule of law that such justifications will excuse a presumptively discriminatory population deviation (if it is not too large to be excused) only where a good faith effort has been made in constructing districts "as nearly of equal population as practicable."

*Reynolds v. Sims, supra,* 377 U.S. at 577, 84 S.Ct. at 1389. The rule is set forth in *Brown, supra,* in footnote 6 to the majority opinion:

"6. In contrast, many of our prior decisions invalidating state apportionment plans were based on the lack of proof that deviations from population equality were the result of a good-faith application of legitimate districting criteria. See, e.g., *Chapman v. Meier,* 420 U.S. 1, 25, 42 L.Ed.2d 766, 95 S.Ct. 751 [764] (1975) ('It is far from apparent that North Dakota policy currently requires or favors strict adherence to political lines.... Furthermore, a plan devised by [the special master] demonstrates that ... *the policy of maintaining township lines [does not] preven[t] attaining a significantly lower population variance.*'); *Kilgarlin v. Hill,* 386 U.S. 120, 124, 17 L.Ed.2d 771, 87 S.Ct. 820 [823] (1967) (per curiam) (district court did not 'demonstrate why or how respect for the integrity of county lines required the particular deviations' or 'articulate any satisfactory grounds for rejecting at least two other plans presented to the court, which respected county lines but which produced substantially smaller deviations'); *Swann v. Adams,* 385 U.S. 440, 445–446, 17 L.Ed.2d 501, 87 S.Ct. 569 [572–573] (1967) (no evidence presented that would justify the population disparities)." (Emphasis added.)

Similarly, it should be said of H.B. 746 that Idaho's state constitutional mandate of maintaining the integrity of county boundaries, together with other policies articulated in our earlier decision in *Hellar v. Cenarrusa,* 104 Idaho 858, 664 P.2d 765 (1983) (*Hellar I*), do not prevent attaining a "significantly lower population variance" than 32.94%. Indeed, the record before us establishes no less than 10 alternative plans with population deviations of less than 10% and which serve the same state policies as those advanced in justification of the 32.94% deviation:

| Plans | Deviation |
|-------|-----------|
| 6A & 6B | 8.76% |
| 11A & 11B | 9.55% |
| 12A & 12B | 9.01% |
| 13A & 13B | 9.01% |
| 14A & 14B | 9.65% |

Additionally the record establishes seven other plans (also with "B" variations) with deviations of less than 19% (making in all 12 "A" plans and 12 "B" plans with deviations under 19%). Both Plan 14–B and H.B. 746 advance the state policy of not dividing counties in the formation of legislative districts. Since both meet that requirement it cannot logically be argued that the scheme of H.B. 746 is necessary to preserve that state policy. The four dissenting Justices in *Brown v. Thomson, supra,* noted:

"We have warned that although maintenance of county or other political boundaries can justify small deviations, it cannot be allowed to negate the fundamental principle of one person, one vote. E.g., *Connor,* 431 U.S., at 419, 52 L.Ed.2d 465, 97 S.Ct. 1828 [at 1836]."

It is argued that language in our preceding decision in *Hellar v. Cenarrusa,* 106 Idaho 571, 682 P.2d 524 (1984) (*Hellar II*) suggests a determination of constitutionality for a plan with 32.94% population deviation. While it is true that we stated in dicta in *Hellar II* that a plan with an assumed population deviation of 41.3%, in light of *Brown, supra,* would not necessarily be unconstitutional where it was designed to accommodate Idaho's "county-boundary" constitutional requirement and unique state policies and interest, such a supposition would certainly not apply where alternative plans exist which meet the same objectives and have below 10% deviations. It would be unreasonable to assume we intended to suggest our state legislature could ignore federal constitutional case law. The United States Supreme Court cases speak for themselves.

Defense counsel were requested to provide, if such existed, one single federal court decision sanctioning deviations in excess of 20% when plans with less than 10% were before the court. None were cited (our research indicates there are none). Thus, although we are most reluctant to declare H.B. 746 unconstitutional, the requirement that we apply the Fourteenth Amendment Equal Protection Clause in a manner consistent with the decisions of the United States Supreme Court compels such a result.

The equal protection guarantee of the Idaho Constitution, contained in art. 1, § 2, *see Langmeyer v. State,* 104 Idaho 53, 54, 656 P.2d 114, 115 (1982), and the right of suffrage guarantee of Idaho Const. art. 1, § 19 likewise require that we hold H.B. 746 unconstitutional. The protections of Idaho's constitution are no less compromised by a districting plan with 33% population deviation among districts in the face of equally well suited plans of less than a third that percentage than are the federal constitutional protections. Idaho's Constitution stands on its own, and although we may look to the rulings of the federal courts on the United States constitution for guidance in interpreting our own state constitutional guarantees, we interpret a separate and in many respects independent constitution.

## III.

## GERRYMANDERING

Evidence (unrefuted) was presented of "gerrymandering" in three counties involving approximately one-third of the state's legislative districts. The division of Ada County (Idaho's most populous county) is as set forth on the map attached hereto as Appendix A. The shape of District 15 was described by plaintiffs' counsel as "a fish" or "a sports car heading out of town." The corridor connecting the north and south portions of District 14 is less than ⅛ mile wide. The affidavit of Susan Stacy (Director of Planning and Community Development for the City of Boise) compares the division of Ada County under Plan 14–B and H.B. 746 and provides some of the factual basis of the gerrymandering charge. It is noteworthy that either by pure chance or by design the scheme of

H.B. 746 does not put one incumbent legislator against another in either Ada, Canyon or Twin Falls counties, the three counties as to which evidence of gerrymandering was presented. The Stacy affidavit states:

> "The H.B. 746 plan shows the typical characteristics of political gerrymandering: shoe string connections, odd-shaped long narrow districts, dispersion of urban populations into larger rural areas, and the unnecessary splitting of established neighborhoods."

Thus H.B. 746 is further tainted by its failure to provide coherent districts by the use of geographic and other obvious borders to the end that neighborhood and urban and rural populations will not be unnecessarily divided. Its "stretched" districts suggest the effects of an "indiscriminate districting, without any regard for political subdivisions or natural or historical boundary lines" which the United States Supreme Court saw as "an open invitation to partisan gerrymandering." *Reynolds v. Sims, supra,* 377 U.S. at 578, 84 S.Ct. at 1390.

## IV.

### THE 1984 ELECTION

The 1984 legislative elections shall be conducted under Plan 14–B. Petitions were filed herein requesting modification of Plan 14–B by sub-districting of Canyon, Twin Falls, and Kootenai counties; however, the petitions have been withdrawn.

A petition has been filed on behalf of the Ada County legislative delegation requesting the elimination of the floterial district over Ada County and the formation of eight districts within the county in the place of the seven districts (plus a floterial district) provided by Plan 14–B. Such a modification at this late hour would cause further delay due to the time required for the taking of evidence and would complicate the election timetable; therefore the request is denied.

Costs and attorney fees on appeal to the plaintiffs.

DONALDSON, C.J., and BISTLINE, J., concur.

592

APPENDIX A

BISTLINE, Justice, specially concurring.

The 1984 legislature was drawing to a close without there having been enacted into law a reapportionment plan for this Court's review under *Hellar I*—whereunder, having affirmed the district court's declaration of the unconstitutionality of House bill 830, we would determine the constitutionality of any reapportionment plan which became law. Various and diverse motions and petitions were being presented to us. Accordingly, the Court, on March 26, 1984, sent out this notice:

"The Court has ORDERED that an informal conference of attorneys shall be held on Friday, March 30, 1984 at 10:30 a.m., in the Supreme Court Courtroom, 451 W. State Street, Boise, Idaho, for the purpose of discussing the status of this case."

Court convened at the appointed time, and we heard at length from counsel representing the various parties and proposed intervenors. At this time we were informed that the legislature was in the process of considering a last minute third reapportionment bill which it contemplated would be passed and sent to the Governor prior to adjournment. We were informed that the proposed legislation would be in compliance with the Idaho Constitution, but that it might not be in compliance with the Federal Constitution. Counsel for Hellar, et al., advised those present that should the Governor sign the bill into law, a petition would be filed immediately seeking a declaration of its unconstitutionality because of excessive population deviation. On the following day the enacted bill was sent to the Governor, and on Monday, it was signed and became the law, subject to this Court's decision on the expected challenge as authorized by the reservation of jurisdiction in *Hellar I.*

On Monday, the second day of April, and the day the Governor affixed his signature to H.B. 746, the Court was in Coeur d'Alene, Idaho, hearing appeals at its spring term.

With due and circumspect regard for the seriousness of the question and the short-ness of time caused by the legislature's last-minute actions, the Court rearranged its North Idaho schedule. The following order was prepared by Justice Shepard in Boise, and immediately sent to counsel for all parties and proposed intervenors:

"The Court having issued its opinion herein on January 4, 1984, affirming the judgment of the trial court as modified therein and retaining jurisdiction of this case until further order of the Court; and thereafter House Bill 746 as amended in the Senate reapportioning the Idaho Legislature having been enacted into law on April 2, 1984; and the Plaintiffs having thereafter filed with the Court a PETITION TO REVIEW REAPPORTIONMENT PLAN ENACTED BY HB 746AA on April 2, 1984; and T.W. STIVERS et al. having filed a PETITION FOR LEAVE TO INTERVENE with the Court on March 30, 1984; and the Court having determined that it should promptly hold a hearing to determine the above petitions and the constitutionality of House Bill 746 at the earliest possible time by shortening the time for notice of hearing and eliminating the filing of briefs pursuant to extraordinary appellate procedure under Rule 44 of the Idaho Appellate Rules,

"NOW, THEREFORE, IT IS HEREBY ORDERED that a hearing for oral argument is hereby set before this Court at two o'clock p.m. on Friday, April 6, 1984, in the courtroom of the Nez Perce County Courthouse, Lewiston, Idaho, for the purpose of hearing oral argument upon the PETITION TO REVIEW APPORTIONMENT PLAN ENACTED BY HB 746AA of the Plaintiffs, and the PETITION FOR LEAVE TO INTERVENE of T.W. STIVERS et al. and the constitutionality of House Bill 746.

"IT IS FURTHER ORDERED, that the Clerk of the Court give immediate notice of this NOTICE OF HEARING to include all known parties, intervenors and petitioners herein.

"IT IS FURTHER ORDERED, that the Court will advise all appearing par-

ties and their counsel as to the time and sequence of oral argument immediately before commencement of the above hearing."

The Court convened at the scheduled time and place to hear and consider argument as to the constitutionality of HB 746. In accordance with the procedure we had unanimously agreed upon, after we had heard everything counsel for all parties had to offer, the Chief Justice advised those present exactly what we were doing:

"CHIEF JUSTICE DONALDSON: If counsel would stay for a few minutes after we take our recess and go back, I don't know if we can come out with a decision today, but we'll see where we come. We'll let you know. If not, we will try to have at least an order out by Monday sometime. I know everybody's concerned, and then a written opinion would have to follow, but we could at least get an order out and as soon as we adjourn, we'll decide whether we can do anything today or if we'll have to do it Monday. We appreciate all of counsel coming up here. It's rather historic that we have this argument of reapportionment in the first capitol of Idaho. Who knows, if they hadn't changed the capitol, we might have had all these arguments up here in North Idaho. If there is nothing further, Court is adjourned."

There was no suggestion from anyone present that the case had not been fully presented. It was ripe for decision, and the members of the Court were aware that an immediate decision was both necessary and expected by the parties. After some deliberation, counsel were advised that our decision would be rendered on Monday morning, April 9, 1984. Faithful to our commitment, the following order was entered:

"The Court having entered its second opinion in this matter on January 4, 1984, approving Plan 14–B referred to therein but retaining jurisdiction until further order of this Court; and thereafter H.B. 746 AAS reapportioning the Idaho State Legislature having been enacted into law on April 2, 1984; and the Plaintiffs there-after having filed a PETITION TO REVIEW REAPPORTIONMENT PLAN ENACTED BY H.B. 746 AA on April 2, 1984; and pursuant to notice to the parties the Court having heard oral argument thereon at 2:00 p.m. on Friday, April 6, 1984; and the Court thereafter having determined that H.B. 746 AAS is unconstitutional and that the 1984 elections of the Idaho State Legislature should be held under the above described plan 14–B approved by the prior opinion of this Court,

"NOW, THEREFORE, IT IS HEREBY ORDERED, that H.B. 746 AAS reapportioning the Idaho State Legislature enacted into law on April 2, 1984 be, and the same is hereby, declared unconstitutional in violation of the Equal Protection Clause of the Fourteenth Amendment of the Constitution of the United States of America.

"IT IS FURTHER ORDERED, that the 1984 elections for the Idaho State Legislature shall be held under and pursuant to Plan 14–B heretofore described and approved in the Opinion of this Court issued in this matter on January 4, 1984.

"IT IS FURTHER ORDERED, that the date for filing Declarations of Candidacy for the Idaho State Legislature for the 1984 election be, and the same is hereby, extended to 5:00 p.m. on Monday April 16, 1984.

"IT IS FURTHER ORDERED, that written opinions of the Justices of this Court will follow.

"Shepard, J. and Bakes, J. dissent from the foregoing Order and determination."

The Court's opinion and the dissenting opinions of Justices Bakes and Shepard were released one week later on April 16, 1984. The Court in this case determined just as it did in *Idaho State Tax Commission v. Staker*, 104 Idaho 734, 663 P.2d 270 (1982), that the gravity of the situation justified, in fact necessitated, an early release of the Court's opinion. Having not had the benefit of the dissenting opinions—

which apparently were inadvertently not circulated to my office prior to their being publicly released, I feel brief comment is in order, and strongly feel that elaborate comment is not merited.

The issue presented to the Court at the Lewiston hearing on Friday, April 6, 1984, was the constitutionality of H.B. 746 as viewed under the Constitution of the United States and case law of the Supreme Court of the United States applying that Constitution. (I do not yet perceive the dissenters as advocating that the members of this Court are not solemnly sworn to uphold that Constitution.) A majority of this court are persuaded that H.B. 746 is in violation of that Constitution, and have, with what is hoped will be recognized as a display in fortitude and integrity, declared H.B. 746 unconstitutional. Obviously, had one more member joined the persuasion of the dissenting justices, H.B. 746 would have survived. Thus viewed, it was a narrow defeat for those who champion H.B. 746. Thus viewed, one can understand and sympathize with the dissenters.

But, one cannot accept in good grace the tenor and content of the dissenting opinions. Disgruntlement at not prevailing in advocacy ought not to lead to distortion and perversion. A dissenting opinion which is founded in logic and fortified by law would represent another point of view, and surely would be welcome by bench and bar, the public, and certainly the side who has not prevailed. But where, it may be asked, is the dissenting opinion which portrays the law and logic by which the Court should have held H.B. 746 constitutional?

Instead, in what may be observed as pure spleen-venting there are two dissenting opinions which for the most part are seen as charging the majority with denying "these defendants the procedural due process guaranteed them by the United States Constitution." This base accusation is so far-fetched as to remain unworthy of the comment. For certain, to counsel for the defendants, who have fairly and candidly presented their case in opposition to the Hellars, it will come as a surprise to see dissenting opinions premised on theories and principles which were never advocated—nor claim ever made that they were being so unconstitutionally deprived of their rights to be fairly and fully heard. It will be both surprising and disappointing were the defendants to seize upon the theme of the dissenting opinions as a predicate upon which to base a petition for rehearing.

Earlier in this opinion is found the statement to counsel by the Chief Justice following argument, after which mention was made that not one attorney presented suggested that the case had not been fully and fairly presented. So that *all* doubt may be erased in that regard, and with regard to the nature of the accusations of the dissenters, the circumstances require that bench and bar, the parties, and the public be fully advised concerning the presentations made to the Court by the attorneys representing the defendants—the parties which the dissenters declare to have been denied procedural due process. I also include the statement of the Chief Justice made as a preliminary to the hearing:[1]

"CHIEF JUSTICE DONALDSON: This is the time set for hearing arguments in the case of *Hellar, et al. v. Cenarrusa, et al.* There are three matters here that are before the Court for consideration. First, of course, is appellants' petition to review the reapportionment plan of 746AA, which is amended twice. Also, we have a petition for leave to intervene by Stivers, et al., filed by Mr. McClure, Deputy Attorney General, and then we have also a petition for leave to intervene of James Risch and T.W. Stivers by Mr. Thomas. Those two petitions, I believe, were only filed down in Boise the last day or so and we just received copies of them. I gather there is some dispute as to who is exactly repre-

---

1. It will be noted that under constraints of time and in the interests of brevity, I have not included the remarks of Mr. Costello, who appeared on behalf of the Governor. His remarks in the main conveyed the Governor's point of view that H.B. 746 was preferable to Plan 14-B. For certain, Mr. Costello claimed no deprivation of procedural rights.

senting who and as to how many. Is that true Mr. McClure? Have you and Mr. Thomas agreed in part of it, I guess.

"MR. McCLURE: Your Honor, I believe that that dispute has been resolved. Mr. Thomas will be here representing, as I understand, the President Pro Tem of the Senate, Mr. Jim Risch and Speaker of the House, Mr. Tom Stivers. I have been asked, as you know, last week by the House of Representatives to intervene on part of the entire House requesting this Court to impose a different reapportionment plan should House Bill 746 be found to be unconstitutional. I hope that those lines are still to be drawn.

"CHIEF JUSTICE DONALDSON: Is that in agreement with you, Mr. Thomas, as your understanding?

"MR. THOMAS: If it please the Court and counsel, I think, Your Honor, that is satisfactory. We do find ourselves in a situation that we need more time to resolve (unintelligible) I think that suffices.

"CHIEF JUSTICE DONALDSON: Mr. Givens, I know that you have not received these until maybe the last day or so, what is your position in the matter?

"MR. GIVENS: We have never objected to an intervention in this case, and we're not going to start now. I am confused, though, as to, I guess the Speaker of the House is the classic example. Twin Falls delegation has been granted leave to intervene and he was part of that, represented by Mr. Webb. They've asked to get out and Mr. Stivers is part of the House of Representatives, and then—which is being represented by Mr. McClure. Mr. Stivers and Mr. Risch are being represented by Mr. Thomas and, I'd just like to know who's representing whom, in what capacity, all the way through. As much as we can clean this up at this point it would be— there are other petitions to intervene and petitions to get back out, and I'm just not sure who's on the other side.

"CHIEF JUSTICE DONALDSON: You have a point Mr. Givens. I believe that we have filed or received motions that Twin Falls to be let out, also Canyon County to be let out, also Coeur d'Alene to be let out, which are going to be granted because there has been no objection. Mr. Montgomery is still here, I guess, for Ada County under certain circumstances and what I will ask is that as each counsel has a chance to argue, they state who they are representing so we'll be sure and know exactly the position of each one and who they represent. We will reserve final determination on these petitions for leave to intervene, but we will allow you to argue today and then we'll decide, I suppose when we get through, when the final decision is made. But you can go ahead and make your arguments today. I believe that counsel have made arrangements with the Clerk of the Court as to the length of time they are to argue and when they are suppose to receive the green light and when the red light. Appearing on behalf of the appellant will be Mr. Givens, who will do the argument. Mr. Bill Nixon is appearing with him and I guess will not make any argument. Appearing on behalf of the respondent Cenarrusa and whoever else you decide at that time you announce, will be Mr. McClure. Appearing on behalf of Governor Evans will be Mr. Costello. I guess we know who you represent, and that's the only person, is that right Mr. Costello?

"MR. COSTELLO: Yes, Mr. Chief Justice.

"CHIEF JUSTICE DONALDSON: All right. Then we have attorneys for Risch, et al., which will be Mr. Thomas, and I guess Jess Strother will also argue. And then we have Ada County, at the last, Mr. Gary Montgomery will do the argument. If we have all of the ground established, why, we can commence. We will start off I believe, it's your petition Mr. Givens, then you may begin.

. . . .

"MR. McCLURE: . . . Mr. Chief Justice, counsel, if it may please the Court. I view the issues before you today somewhat differently that Mr. Givens has stated them. From my perspective the question is wheth-

er House Bill 746, as amended, falls within the Court's order which it issued January 4 of this year. As you know, I was previously arguing that art. 3, § 5 had been preempted. You said that that was not correct, that it had not been preempted. The legislature has since passed a plan which was passed earlier in the session and vetoed by the Governor. The legislature passed a second plan which was ultimately signed by the Governor. That's the plan before you, plan 746. In my opinion, if it would please the Court, I think the issues before you are twofold. Does this comply with the Idaho Constitution, art. 3 § 5, and does it comply with the Federal Constitution, art. 14? While I think it's undisputed that this plan does comply with the Idaho Constitution, art. 3, § 5, there are no split counties other than those which in your provision in *Hellar I* you indicated could be split. I don't think that we've had any disagreement from counsel on this regard.

"The second question, as I see it, is whether there is a permissible deviation in this plan or not. Now, Mr. Hellar—or excuse me, Mr. Givens' argument that 33% is not good enough, I have some sympathy with him. I have in the past had those leanings myself, but this Court told me that I was not correct again, and that a plan with a higher deviation than this would pass constitutional muster. Taking the Court's statement to heart, the legislature did pass this plan. It has a deviation, according to the aggregate method, of 33% approximately, and a deviation according to the component method of 37% approximately. Each of those deviations, no matter how computed, is lower than the deviation this Court said would certainly stand constitutional muster. Therefore, Your Honors, it seems to me that the law of this case is that this deviation is acceptable.

"CHIEF JUSTICE DONALDSON: Would you agree that was dictum in the opinion of the Court, or not, Mr. McClure?

"MR. McCLURE: Mr. Chief Justice, it was certainly dictum. It was not holding. If I can state on behalf of the legislature, on behalf of the House whom I do repre-sent, it was certainly something which they took to heart. I think it was no secret that they were not fond, and are not fond, of plan 14B because of the large geographical areas in the floterial districts and the complicated electoral system which would be involved. Yes, I do agree that it is dictum and not holding. Nevertheless, we have a statement of this Court a mere four months ago that that would be acceptable. And under the terms of *Brown v. Thompson* that may be acceptable under federal law whether its dicta or not. I would certainly believe that it is. *Brown v. Thompson*, as you are all aware, was from Wyoming. The court had before it an approved plan of 89% deviation, the Supreme Court of the United States saying that the plaintiffs had challenged the method of computation of the deviation incorrectly. They had simply challenged the worst case, assuming, I suppose, that the plan was only as good as its worst county, like a chain only so strong as its weakest link. The court said that's not correct. This 23% deviation which is caused by the worst county, the difference between 66% deviation and 89% deviation, they said this 23% deviation is and I quote, "not significant." In that regard I would urge you to read further into *Brown v. Thompson* where the court has said we can take special consideration of sparse geographical areas and of peculiarities in geography.

"JUSTICE HUNTLEY: Counsel, if you'll excuse me, while you're on *Brown* and on that very point, I'm reading the *Brown case* from page 222 of the Lawyers Edition. On that page they state first, that anything under 10% classifies as minor deviation. The next paragraph they say that anything over 10% is prima facie discrimination, and then they come to this statement, and I'm quoting: "De minimis deviations are unavoidable but variations of 30% among senate districts and 40% among house districts can hardly be deemed de minimis and none of our cases suggest that differences of this magnitude will be accepted without a satisfactory explanation grounded on acceptable state policy." Now, with that mandate in mind and being cognizant of

the fact that this Court is required, in enforcing the federal constitution, to go by the decisions of the United States Supreme Court, are you aware of a single case by the United States Supreme Court, or any federal three-judge court which approves deviations in excess of 20 to 30% where there were, before that court, plans of lesser deviations below 10% like we have here?

"MR. McCLURE: No, Your Honor, I'm not aware. I would point out that I agree with your reasoning of the *Brown* decision, the state does have the burden, and we recognize that, of justifying and, as in *Brown,* the state justified the deviation by citing a rational state policy of observing county boundaries and they found also that it was—that county boundaries were followed without any taint of arbitrariness or discrimination. I think that even in this case the only question of discrimination or arbitrariness which the appellants have raised is involved in the way we have split counties. As permitted by this Court's opinion in *Hellar I,* it doesn't appear to me, Your Honor, that the distinction—or, excuse me, it doesn't appear to me, Your Honor, that the justification and supporting rationale for acceptance of this plan is any different than the justification and supporting rationale in *Brown v. Thompson* in which they said 23% is okay. They said that there are these unique factors that we can allow. They said Brown had, for example, an average deviation of 16%. The affidavit of Susan Benion, which I've just filed this morning, Your Honor, it says that this plan 746 has an average deviation of 7.22%, a far lower average than in *Brown.* Part of the reason, in my view, that the court ruled as it did in *Brown,* was that the legislature in the State of Wyoming had attempted to take into consideration unique factors such as we have been trying to do in this case, Your Honor. For example, Bonner and Boundary counties, there is no way given their makeup, given the population in each of those counties and the fact that they are surrounded by two states and a foreign country, there's no way to put those together with Kootenai County which lies to the south without creating a large multi-member district or a large floterial district. Thereby, in my opinion, and I think in the plaintiff's opinion, as well, causing great confusion for the voters in that area. What the legislature has tried to do in this, Your Honor, is keep to as many single member districts as possible, hoping as the evidence of defendants presented at trial, that single member districts will result in more hotly contested elections and more voter awareness. If you take out that case, and if you also take out the case of the five counties, one of which we are now in. If you take Latah, Nez Perce, Lewis, Idaho and Clearwater Counties, the way they fit together in terms of population, you can either represent them with three or with four. If you represent them with three senators and six representatives, then they are under-represented by 15%. If you represented them by four then they are over-represented by 12%. There is no satisfactory solution; no way to treat these. We have taken the lowest way out in this particular circumstance. If you take those two worst cases and you say these are justifiable, rationale policies that the state can observe when it reapportions, then this plan has a total deviation, these two situations, of 24%, not at all unlike that 23% in *Brown v. Thompson,* which was found to be not significant.

"CHIEF JUSTICE DONALDSON: Mr. McClure, you were talking about those districts. Were those the floterial districts you're talking about?

"MR. McCLURE: Your Honor, the district in this area? In Nez Perce County?

"CHIEF JUSTICE DONALDSON: Yes, you were saying that they were either under-represented or over-represented.

"MR. McCLURE: The question is, Your Honor, whether you include three districts or three districts and a floterial district. If you include three districts and a floterial district, then you cause them to be some 13% over-represented.

"CHIEF JUSTICE DONALDSON: Now, you're talking about the floterial district as outlined in 746, it it?

"MR. McCLURE: Yes, Your Honor.

"CHIEF JUSTICE DONALDSON: What if you made that floterial district ten counties instead of the upper five, then what do you get?

"MR. McCLURE: You get a district about 300 miles long and it's very difficult to campaign, but you do reduce the deviation, you're correct. I am not aware precisely what that deviation is. I understand it's somewhere in the neighborhood of 22%.

"CHIEF JUSTICE DONALDSON: While you're interrupted, the one case you might want to talk about is *Stewart v. O'Callahan,* which is a Nevada case, 1972, that allowed a 31% deviation. You maybe haven't had a chance to look at it, and I haven't either, but I read about it.

"MR. McCLURE: Your Honor, I have looked at it before, in fact.

"CHIEF JUSTICE DONALDSON: Is that comparable to Idaho, do you feel?

"MR. McCLURE: Your Honor, I can't comment on that. I haven't looked at it recently.

"CHIEF JUSTICE DONALDSON: I understand that. We're all under a time frame where we haven't had a chance to do all the research we might like.

"MR. McCLURE: I do know, however, that you are correct and that they approved that. In fact, Judge McNichols was on the three-judge panel which did so.

"CHIEF JUSTICE DONALDSON: It was a federal, a circuit court.

"MR. McCLURE: Yes, it was.

"JUSTICE HUNTLEY: Do you recall, counsel, whether in that Nevada case there were plans presented with lower deviations?

"MR. McCLURE: I do not recall, Your Honor. The evidence which Mr. Givens has presented today concerning uncontested races, voter turnout, popular vote v. legislative seats is interesting, certainly a factual question. You've indicated that we would be allowed, I hope, the opportunity to litigate that should we feel that it is a factual issue of importance.

"CHIEF JUSTICE DONALDSON: Did you have an opportunity to argue that fact in *Hellar I and II* Mr. McClure?

"MR. McCLURE: This type of evidence—

"CHIEF JUSTICE DONALDSON: I know it's slightly different, but they look very familiar to me as from the original *Hellar II* case anyway.

"MR. McCLURE: Your Honor, I believe that the uncontested races and the voter turnout, if you split counties, that is new. I would suggest that there are any number of factors which could affect why the number of uncontested races have gone up in the last twenty years. I don't think it's even probable that you should assume that's from reapportionment. I would suggest that's a factual question that ought to be delved into on trial.

"CHIEF JUSTICE DONALDSON: Well, do you wish then that we hold in abeyance the decision and let it go back for an evidentiary hearing?

"MR. McCLURE: No, Your Honor, I don't feel that you need to do that. I feel that as a matter of law this is not relevant to the decision before you.

"... . (At this point, Mr. McClure's presentation dealt with an omitted precinct in Twin Falls—concerning which there is no issue—the omission having been corrected under an applicable statute.)

"CHIEF JUSTICE DONALDSON: We'll next hear, I believe, Mr. Thomas.

"MR. THOMAS: Mr. Chief Justice and members of the Court, Counsel, it is our purpose here today, and with the indulgence of the Court, we will split our time between Mr. Strother and myself, to represent the intervenors Risch and Stivers in the furtherance of the proposition set forth in Senate Concurrent Resolution 116 in the immediate past legislature. In doing so we do appear in support of the position taken by the Attorney General with respect to House Bill 746AA, but we are handicapped, if it please the Court, by the fact that until this very afternoon our standing in this

case was unestablished. We have not been served with nor read affidavits and other materials. I apologize for that state of unpreparedness. I would like to bring to this discussion a few comments, if I may, from the point of view of the leadership of the House and the Senate and the point of view articulated in Senate Concurrent Resolution 116. The legislature, perhaps incorrectly, but literally, read the three judge panel court opinion of *Summers v. Cenarrusa* some years ago and believed that the State Constitution prohibiting the crossing of the county lines in the district situation we've been discussing was unconstitutional, proceeded to adopt what it though was an appropriate statute and then learned by the earlier decision in this case, that that was indeed a misreading and that the county line prohibition provision of Art. 3, § 5 is constitutional. The further proceedings of this Court led to an admonition directing to the legislature its awareness of a duty to come forward with a legislatively produced and designed plan, if it could, to discharge its public responsibilities. Failing that, 14B would be the law of the State. We, at the request of the legislature under that resolution, as this Court is aware, did commence contesting litigation in the United States District Court for review of 14B. That matter is pending at this time in that court. Today we think that it will be appropriate if 746 is sustained to dismiss as moot the federal case and put at rest at long last this difficult issue in our state. As Justice Huntley pointed out, the presumption against which this work is done are difficult, and the cases that have been written, though few on the list before us, are numerous in the briefs that have been filed and it's very difficult to put them all together and come to a simplistic conclusion a rule of thumb that tells us what's good and what's bad. Indeed, I think what one concludes with is the very interesting and pertinent quote that Justice Huntley shared with us a moment ago, and that is that we must look to the particulars of the state to determine whether these apparently gross and inappropriate deviations are justified. In the case before the Court

today, House Bill 746 contains a rather articulate and brief, but I think complete, statement of the justification for the deviation and I refer to section 1 of 746 which discusses, in a unique fashion as legislation of this variety goes, the basis for the conclusions that this legislature came to. And the elementary fact is that Idaho is a very special and unique place in the way that its population is divided, its roads run, its mountain ridges present themselves, sometimes we say, as monuments of beauty, but other times, as great impediments to the socio-economic activities of our state and, indeed, the political. And so it is that I think the provisions of this bill at section 1 give the answer that the Supreme Court inquired after in Justice Huntley's quote, as to why in Idaho have you done this? The answer is that in Idaho we seek not to cross the county lines in violation of the state constitution and to accommodate what is indeed an effective and reasonable program of representation of our people and our legislature and the imperfections insofar as ratios are concerned are indeed well rationalized in this presentation. We would therefore submit, respectfully, that if we have learned from this case and from the federal court litigation a lesson that would guide us well, it is that these determinations are uniquely well-placed with the legislature. It is extraordinarily difficult under the rules of practice and of our profession of the judicial branch to go into the kinds of factfinding and weighing that this challenge requires of the ultimate arbiter. We think, if it please the Court, that it is appropriate that the priority has been given and the preference articulated for legislative enactment in this field. We think that 746 does that well and, absent the papers that have been filed the last few days, Mr. Strother has a few remarks he would like to present on our behalf with regard to what our research has suggested.

"CHIEF JUSTICE DONALDSON: Mr. Thomas, you made an offer that if we sustain House Bill 746 that you would dismiss your petition or claim in the federal court as to plan 14B. However, I don't

think you'd get Mr. Givens to make the same offer if we should sustain.

"MR. THOMAS: If it please the Court, I didn't mean that to sound as if it were being a suggestion that it would induce the Court in any respect. I wouldn't do that, and I respectfully Mr. Givens' position in this matter. The thought I had in mind was that it would, on final adjudication, I'm sure render moot any further proceedings in those matters. You're quite correct in pointing out that Mr. Givens has a serious issue that he presents and pursues and we would have to see how that unfolds as we indeed watch all litigation unfold.

"JUSTICE HUNTLEY: Mr. Thomas, you open your remark with the matter that did raise the Chief Justice's question, I think you stated that you would consider dismissing that federal court case and bring this matter in this state to probably an early conclusion.

"MR. THOMAS: Yes, sir.

"JUSTICE HUNTLEY: As you appreciate it, no doubt, this Court in past federal constitutional questions has to be guided by the mandates of the United States Supreme Court.

"MR. THOMAS: I certainly do, sir.

"JUSTICE HUNTLEY: And I think we should be up front with what has to concern us here. Now, in addition to the cases that are set forth there on the jury box, I've had research done where we've been presented with a University of Pittsburgh Law Review that has virtually every United States and Federal District Court decision listed with their deviations and whether they were approved or not. And, just to cite a few, we have cases, Delaware where 33% was rejected as unconstitutional; Florida, 28%; Illinois, 16%; Indiana, 37%. Now in the record we have before us, we have plan 6A and 6B that have an 8.76 deviation. We have plans 11A and 11B with a 9.5% deviation. We have 12A and 12B with a 9.01%; 13A and 13B with 9.01%; and then 14A and 14B with the 9.65% under the aggregate method. Are you aware of any federal court decision that approves the deviations in the magnitude above 30% where there were plans presented with deviations below 10%?

"MR. THOMAS: Mr. Chief Justice and Justice Huntley, if it please the Court, I believe that the case we are talking about involves, in fact, a 41.3% deviation which has been reduced, if 746 is adopted, to 37%. The difficulty with the Court's question is that there are legal issues implicit in those computations and in the statistical magic, if you will, of the lexicon of those witnesses. And while I appreciate that both this Court and others have sometimes indicated that those may be viewed as intricate factual morasses into which we do not wish to wade, the reality is that that's where the action is, and I believe, if it please the Court, that this use of the aggregate method poses constitutional issues, and therefore that we cannot answer the question based upon the assumption that those are the percentages and those are the facts. I think the component method has to be looked at, rather than the aggregate, if it please the Court. In my personal opportunity to prepare for this hearing today doesn't put me in a position to say more than that. I cannot even claim to have seen the Pittsburgh Law Review article you mentioned. I do believe, however, that that is the issue that concerns us. We are looking today at an opportunity to reduce the problem from 41 to 37 percent and that would be a step in the right direction.

"JUSTICE HUNTLEY: Would you care to address the question under either the aggregate or component method? Has the United States Supreme Court ever approved deviations in excess of 30% where there were plans available with 10% or below?

"MR. THOMAS: I would be happy to do so, given an opportunity, Mr. Justice. I have not today had that opportunity. Mr. Chief Justice, I see the red light and I apologize for being lengthy, but I wonder if I could indulge upon the Court's patience to ask for just a moment or two for Mr. Strother's at least summary.

"CHIEF JUSTICE DONALDSON: Yes, we interrupted you for some questions, so if we have impinged upon Mr. Strother's time, we'll give him some additional time.

"MR. THOMAS: Thank you, Your Honor.

"CHIEF JUSTICE DONALDSON: Do you think you can do it in five minutes, Mr. Strother, at least make a running jump at it?

"MR. STROTHER: I can make a very good running jump, Your Honor, I believe. At the outset, Your Honor, we concur with the statement by the Attorney General that the Court's decision in what was referred to in the *Hellar*—in the federal action as *Hellar II,* the case decided on January 4, 1984, is the law of this case. I think the implications of that are that, right or wrong, that the decision must be followed in subsequent decisions here, the only exception that appears to have been recognized by this Court prior to this time is if there was an intervening decision of the United States Supreme Court which overturns the basis of the Court's original determination. There is no intervening decision in this case. Therefore, I would suggest that this Court having decided that 41.3% variation was acceptable that it *must,* as a matter of proper judicial practice, accept the deviations in House Bill 746. In this connection, I would note that we disagree with the Attorney General on one point. The holding that 41.3% was an acceptable deviation was a necessary part of the Court's ruling as we understand it. As was pointed out in the dissent to the *Hellar II* decision, the Court did not address the issues of whether the aggregate or the component method was the correct method. Viewed in that context, the statement that a plan of 41.3% is acceptable was apparently used by the majority to avoid a decision between the aggregate and component method. Only with that decision unnecessary does the—can the Court fairly say that it would have addressed all of the issues raised by the Attorney General on the appeal. Now the Court did not act in a vacuum when it made the statement that 41.3% was an acceptable deviation. It did so at the specific urging of the Hellars who now come to this Court and say that a plan of lesser deviation is unacceptable. I notice that on none of the charts that are mentioned here do the Hellars mention—or that are presented here, do the Hellars mention the cases that they cited in their briefs to the Court, specifically those from Hawaii in which the Hellars themselves assert the United States Supreme Court has approved a reapportionment plan with a 34.6% deviation. These are cited on pages 76–80 of one of their briefs to this Court. Now, the rationale there was that Hawaii, the state at issue, was a unique state, given the number of islands and so on and so forth, we suggest that the Hellars, having urged the uniqueness of Hawaii and of Idaho, by inference, pointing out the many wilderness areas, the difficulties of transportation and so on and so forth, we believe they are estopped to come before this Court and say we did not mean what we said before. In fact, they told this Court that 41.3% was acceptable and we think that they cannot now turn around and say it is not. Finally, to answer Justice Huntley's frequent question, I think the decisions of the United States Supreme Court frequently show instances in which the Court has approved plans where plans of lesser deviation were available and were well known. In *Mahon v. Howell,* for example, the Court approved a 16.4% deviation when the district court has proposed a plan with a less than 10% deviation. In *Gafne v. Cummins,* the Court approved the plan that numerically was not as good as other plans that had been proposed in Court. The reason that the Court did so is that reapportionment is a legislative matter primarily, that the legislature is entitled to consider matters other than strict population and that the Court even recognized in *Gafne* that it was a political matter. Hence, the fact that the plaintiff has introduced plans of lesser deviation is of no real consequence. All the legislature has to do to make a plan that's good enough to pass constitutional muster. If it achieves that standard, it doesn't matter if it does so by a

little bit or by a lot. Once it achieves constitutional—once it is correct under constitutional standards the inquiry need go no further. With respect to Mr. Givens' last argument, the republican form of government, there is a long line of United States Supreme Court authority to the effect that no claims arising under Art. 4, § 4 are justiciable. *Baker v. Carr* is, I believe, the latest one in the field of reapportionment. There is quite a lengthy discussion there. My time is up. If there are any questions of the Court I'd be happy to take them up.

"CHIEF JUSTICE DONALDSON: There are no questions. Thank you, Mr. Strother.

. . . .

"MR. MONTGOMERY: Mr. Chief Justice and members of the Court ad counsel, my desire is to take just a moment or two, leave the legalistic arguments to the others, and simply enter to you today, both as an attorney representing the Ada County delegation and as a legislator, one intimately acquainted with the process we've just been through, to enter with you a plea, which I know is shared by the members of that delegation and almost universally, shared by all 105 men and women who serve in that legislative body and represent the citizens of our state statewide, and that is, our genuine hope that this Court can see its way clear to approve this plan which is now before you, and which through an agonizing process, we've been able to work out. We've looked at so many plans and so many variations of plans that we go home at night with bloodshot eyes and see them in our sleep at night. Every plan that we considered disadvantaged somebody, some district, some element of our state. There is no ideal plan. And every time we would consider one, seriously, somebody had to swallow awfully hard. But, there is almost universal agreement among the members of the legislature, that almost anything would be better for the State of Idaho than plan 14B. That's the plea I issue to you today. Some felt that 14B might be a good Republican plan. There were a few who felt it might be a good Democratic plan.

But, the universal view was that it was not a good plan for the State of Idaho for reasons, I'm sure you've heard previously. Just two other thoughts, then, if I may. One is that, given the restriction that we must deal with, that is the sanctity of the county boundary line, it was our feeling in this effort to achieve something that would meet both the state and federal constitutional requirements that surely, surely given that county boundary line restriction an overall deviation in excess of 10% would be justified. We proceeded under that assumption and I believe it is. We, for example, just one quick interjection. We had one plan that we thought looked good and would have resulted in a little smaller deviation and the kind of problems we ran into was that the good lady who would represent one of the districts would have to cross a mountain range to get to the other half of her constituency. We've had some unique and difficult problems as we have tried to work this out. Finally, I just want to suggest that the argument—that there's an Achilles Heel in the argument that has been submitted by Mr. Givens to the effect that somehow we've engaged in a process, and carried on in House Bill 747 as well, of gerrymandering and districting in such a manner that it benefits one party over another. The Achilles Heel is this. The Bill you have before you today was passed overwhelmingly by both the House and the Senate, by both parties of the legislature, both Democrats and Republicans because we believed as a body that it was superior to plan 14B and the best interests of the State of Idaho. And I close, as I opened, with a plea that you can somehow see your way clear to approve this plan and let it stand as the law in this matter. Thank you.

"CHIEF JUSTICE DONALDSON: You're not really then asking us, as you did before, that in the event that 746 is not approved that we make the modification as to Ada County under 14B?

"MR. MONTGOMERY: Mr. Chief Justice and members of the Court, thank you; I failed to address that. What I am saying

today that the Ada County delegation would prefer House Plan 746, we would much prefer. If for some reason that is not accepted by this Court we would still seek the modification to Ada County.

"JUSTICE SHEPARD: Mr. Montgomery, it seems to me that when we last heard argument on this matter that you were the one that addressed the question that the Chief Justice posed a few moments ago as to the costs of 14B in the remodeling necessities. Were you? Do you remember?

"MR. MONTGOMERY: I may have been. It's certainly, Mr. Chief Justice and Justice Shepard, certainly something that we've had under keen consideration. I can tell you personally, I have walked that House chamber trying to figure out where you would put another 14 people, and there isn't a place to put them. The last remodeling job was in excess of $600,000 and the cost to remodel the House to put another 14 people in there is just going to be enormous not to mention the fact that it makes it that much more cumbersome with a larger body. Voting boards won't fit. We just have all kinds of problems under 14B.

"JUSTICE HUNTLEY: Mr. Montgomery, you state that the legislature did consider a number of plans. Was serious consideration given to any plans which reduced the size of the Senate and the House?

"MR. MONTGOMERY: Mr. Chief Justice and Justice Huntley, yes, there was serious consideration given. We could not achieve a concensus on both sides of the House among both parties for a plan that would do that because of the many consideration that have been discussed previously.

"CHIEF JUSTICE DONALDSON: Any other questions? Thank you."

Leaving it to the reader to decide for himself or herself the validity of the charges made against the Court's majority opinion, I turn to two other facets of the dissenting opinion of Justice Bakes. In discussing his assertion "that the defend-

ants' constitutional rights have been violated in this reapportionment dispute," at p. 560 he points out that the petitioners, Hellar, et al., on March 31, 1982, (which would have been at or near the end of the 1982 legislative session) filed an *original proceeding* in this Court challenging the constitutionality of H.B. 830, as passed and enacted into law. Justice Bakes then notes that "This Court in an order dated April 2, 1982, refused to grant that original proceeding ...." The Court did not refuse, and what actually happened was the summary entry of an order denying the relief sought:

"ORDER

"WHEREAS, the Petitioners herein, by and through their attorney of record, filed with the Clerk of this Court on the 31st day of March, 1982, a VERIFIED PETITION FOR ALTERNATIVE WRITS OF MANDATE AND PROHIBITION, and a BRIEF IN SUPPORT OF REQUEST FOR ALTERNATIVE WRITS OF MANDATE AND PROHIBITION, AND

"WHEREAS, the Court has fully read and considered the said VERIFIED PETITION and the said BRIEF and being advised in the premises,

"IT IS HEREBY ORDERED AND THIS DOES ORDER that the said Verified Petition be and the same hereby is DENIED."

It will be noted that it was under the stewardship of Justice Bakes as Chief Justice that summary disposition was so made—in a manner of less than two working days! The file in that case shows that Mr. Givens filed the petition on Wednesday, March 31, and that although the order of denial was entered on April 2, Justice Bakes as Chief Justice, knowing that one member of the Court would not be available on April 1, brought the petition before the Court on the day after it was filed and garnered the votes of Shepard and McFadden, JJ.,[2] to add to his own vote in denying

2. The public at large will recognize this coali-    tion of votes as responsible for the ill-starred

the petition. In that manner Justice Bakes served the requirements of due process. In that manner the rules of this Court allowing time for consideration and discussion were fulfilled. But, perhaps that was a justifiable rush to judgment, the thought of which today is abhorrent to the Justice.

It is also suggested in that dissent that the defendants sue today's majority for injunctive and other relief, including perhaps damages, costs, and attorneys' fees. I have but little to say to such a display of non-judicial temperament. First, it is not the shocking surprise it would otherwise be had the proponent not also suggested to Utah Power & Light Company that there should be some way that UP & L could later recover its losses where it had not availed itself of the right to a stay order under statutory procedures. This led to *Utah Power & Light v. Idaho Public Utilities Commission*, 83 I.S.C.R. 921 (issued June 6, 1983), now pending on rehearing, where UP & L, in apparent reliance on the invitation, sought to impose a surcharge on present customers for losses incurred with past customers. At another time the Justice suggested to counsel for UP & L that it give consideration to suing the State of Idaho in inverse condemnation to rectify losses allegedly incurred as a result of erroneous ratemaking decisions of the Public Utilities Commission.

As a parting thought, reference is made to the contention advanced by the dissenters that the enactments of the legislative branch of government are presumed to be constitutional. No quarrel is made with that generality. But, in this particular case, however, our concern is with a reapportionment enactment, H.B. 746 (1984), which was the last-ditch effort of a legislature which was unconstitutionally constituted under H.B. 830 (1982). Only because of exigent circumstances and the grace of the district court, as affirmed by this Court, were the 1983 and 1984 legislatures allowed to convene.

Anent Justice Shepard's opinion wherein he castigates this Court's "paranoid attitude toward legislative attempts to reapportion and its own dogmatic and dictatorial adoption of Plan 14–B," p. 26, while ordinarily where paranoia is concerned, I yield to the views of Justice Shepard, in this particular case nothing surfaces but a case of sour grapes. The problem he encounters is one which eventually besets the dictators of whom he writes—but certainly not the unobtrusive majority in this case.

Perhaps amidst the clamor that has arisen proclaiming the alleged confusion of the electorate and the supposed disenfranchisement of the citizenry from their right to seek office, some voice should be heard in defense of the Constitutions of the United States of America and the State of Idaho—by which people create governments and under which they govern themselves. It is these Charters for self-government that truly give rise to a government not of men but of laws.

It should have surprised no one that a district judge sworn to uphold the state and federal constitutions—following a prolonged and extensive trial whereat the State was given every opportunity and unheard of judicial forbearance—held H.B. 830 unconstitutional. Nor should it have surprised anyone that at least three justices of this Court, also sworn to uphold those constitutions, would hold H.B. 746 invalid. That at the very end of the legislative session both Democrats and Republicans alike were unanimous in preferring H.B. 746 to Plan 14–B, as was the Governor as well, has naught to do with a court's function in passing upon a question of constitutionality. One would like to oblige and please a legislature and a Governor, but one cannot justify doing so at the expense of reneging upon a solemn oath.

Reapportionment being already a matter of public interest, that interest will likely

---

CWIP case, *Utah Power & Light Co. v. Idaho Public Utilities Commission*, 105 Idaho 822, 673 P.2d 422 (1983). The trial bench and bar will recognize the same coalition as responsible for

the notorious *Chandler* opinion, *Chandler Supply Co. v. City of Boise*, 104 Idaho 480, 660 P.2d 1323 (1983).

be heightened in the eyes of those who chance to read the particularly unusual attack of the dissenting justices on the majority opinion. Public broadcasting has seen fit to give the public the benefit of the views of Mike Mitchell, Jay Webb, Dean Summers, and Mike Gwartney, on the legislature's ability to reapportion itself. Public interest might well receive the comments of that or a similar panel in connection with the Lewiston hearing—the whole of which was carefully videotaped and should be available. In that manner the viewing as well as the reading public could better decide if the majority of this Court has indeed trampled upon the rights of the defendants as the dissenters proclaim.

DONALDSON, Chief Justice, concurring and concurring in the result.

I concur in Parts I, II and IV of the majority opinion. However, I concur only in the result as to Part III. The manner in which Ada County was divided into districts under H.B. 746 as amended gives an appearance of impermissible gerrymandering. Particularly so, when compared to a plan presented by the majority of the Ada County legislators who intervened in this law suit. Their proposed plan divided Ada County into eight districts, with no floterial district. The boundaries of the districts substantially followed the district lines in Plan 14(b). However, the plan had a population deviation of 11.39%. Under the guidelines set forth in *Brown v. Thomson, supra,* this is prima facie discriminatory and has to be justified to be held constitutional. To determine the constitutionality of the plan would require an evidentiary hearing and there is insufficient time to hold such a hearing. The deadline for filing declarations of candidacy is only a few days away and the legislature has refused to move the date for the primary elections to a later date. Thus, I am forced to reluctantly concur in the result as to Part III.

Part III approves of the 14(b) Plan for Ada County which contains a floterial district for Ada County. I do not approve of

floterial districts unless they are necessary to bring the population deviation to within constitutional limits.

BAKES, Justice, dissenting:

I must dissent from the action taken by the majority in this case. The majority, in its haste to correct what it perceives as a gross violation of the fourteenth amendment of the United States Constitution, the equal protection clause as represented by the "one man, one vote" principle, has committed an equally gross violation of another equally important clause of the same amendment, the due process clause. The extremely rushed procedure followed by the Court in this, the third chapter of this reapportionment controversy, has denied the defendants in this case any opportunity to present evidence in support of the reapportionment plan adopted by the legislature in H.B. 746, or to counter the factual showing presented in the affidavits submitted by the petitioners, which facts are wholeheartedly endorsed by the majority. This denial of the opportunity to present evidence in support of H.B. 746, or to defend against factual allegations asserted by the petitioners, is a flagrant breach of the due process clause of the fourteenth amendment of the United States Constitution, and of the due process clause set out in Art. 1, § 13, of the Idaho Constitution.

The events that transpired in this case, *Hellar III,* took place over a period of less than one week. On Monday, April 2, 1984, at 4:31 p.m., the Governor signed the reapportionment bill, H.B. 746. A petition seeking review of that bill pursuant to our retained jurisdiction, was filed on the same day, apparently immediately thereafter. The next day, Tuesday, April 3, this Court ordered that an oral argument be held on Friday, April 6. On Thursday, April 5, the affidavit of Humberto Fuentes, and on Friday, April 6, two additional affidavits of Tony Stewart and Susan M. Stacy were filed by petitioners in support of their Petition To Review Reapportionment Plan Enacted By H.B. 746, which petition alleged

that H.B. 746 was unconstitutional.[1] On Friday afternoon, April 6, this Court heard oral arguments on the Petition to Review. On Monday morning, April 9, 1984, without an evidentiary hearing having ever been held, this Court issued an order holding that "H.B. 746 AAS reapportioning the Idaho state legislature enacted into law on April 2, 1984, be, and the same is hereby, declared unconstitutional in violation of the equal protection clause of the fourteenth amendment to the Constitution of the United States of America." The Court further ordered that the 1984 elections for the Idaho state legislature be held pursuant to Plan 14–B which had previously been approved by the Court's opinion of January, 1984. The April 9 order of this Court, and the Court's opinion issued April 16, 1984, one week later, are based primarily upon the facts alleged in the *ex parte* affidavits submitted by the petitioners in support of their Petition To Review, and additionally upon factual allegations and innuendo stated by plaintiffs' counsel at oral argument.

The defendants' due process rights have been doubly violated. First, they have not had an opportunity to have a trial, after a meaningful time for preparation, in order to submit evidence in support of the constitutionality of H.B. 746. Secondly, they have been denied the opportunity to prepare and submit evidence to counter the factual allegations contained in the affidavits submitted in support of the Petition To Review, *or to cross examine those affi-*

*ants.* While the record reflects that certain appearing attorneys were personally served with two of the three affidavits at the time of the hearing in Lewiston, Idaho, on April 6, 1984, the Certificate of Service filed by the petitioners indicates that four others were served with two of the three affidavits on April 9, 1984, and then only by mail from Coeur d'Alene, Idaho. The Court's order finding the statute to be unconstitutional was issued on the same day that those affidavits were placed in the mail in Coeur d'Alene for mailing to those parties or attorneys in southern Idaho. This Court's order was entered before all of the parties or intervenors had been served, based upon petitioners' *ex parte* affidavits, and without giving the defendants a trial after an opportunity to prepare so that they could submit evidence in support of their claim that H.B. 746 is constitutional. It is difficult to imagine a more egregious violation of the due process clause of the fourteenth amendment than has occurred in this case.

This is not the first time that the defendants' constitutional rights have been violated in this reapportionment dispute. It has happened twice before. In the very beginning, these petitioners, on March 31, 1982, filed an original proceeding in this Court in the form of a verified petition, No. 14545, seeking to have H.B. 830, then in effect, declared unconstitutional, and to enjoin the 1982 primary election from being conducted under H.B. 830. This Court, in an order

---

1. The affidavits submitted by the plaintiffs can be summarized as follows: (a) Humberto Fuentes, representing certain Hispanic intervenors, asserted that the division of Canyon County, rather than having legislators run at large, served to effectively disenfranchise the Hispanic vote, and that H.B. 746 was "drawn to protect incumbency"; (b) Tony Stewart, a plaintiff witness at the trial on H.B. 830 and a professor of political science at North Idaho College, asserts that H.B. 746 is substantially similar to the unconstitutional H.B. 830, and includes calculations of the alleged deviation in population, asserting the deviation in H.B. 746 to be 32.94%; and (c) Susan Stacy, the Boise City Director of Planning and Community Development, asserts that H.B. 746 violates several principles that should be used in reapportionment, including the differentiation of rural and urban areas, and

large and small cities, and the lack of use of natural and obvious boundaries and neighborhood coherence.

The defendants filed two affidavits on April 6, 1984, the date of the hearing. One was the affidavit of Ben Ysursa, Chief Deputy Secretary of State, in charge of elections, who stated that if the Court declared H.B. 746 unconstitutional, there would not be sufficient time to conduct an election under any other plan under the existing statutory deadlines. The other was the affidavit of Susan Bennion, who stated that "the average deviation of the reapportionment plan embodied in H.B. 746 AAS, as modified by H.B. 750, is 7.22% according to the aggregate method, and 36.55% according to the component method, explaining which districts caused the deviation. The majority makes no mention of the Bennion affidavit.

dated April 2, 1982, refused to grant that original proceeding in view of the obvious factual issues which would arise in such a proceeding. Thereafter, the petitioners, on April 9, 1982, filed an action in the District Court of the First Judicial District in Shoshone County. Immediately after that action was filed, the petitioners sought a preliminary injunction seeking to enjoin holding the 1982 primary election under H.B. 830 which was then in effect. After hearing on the plaintiffs' motion for preliminary injunction on May 17, 1982, the trial court denied the preliminary injunction. However, in the same order it nevertheless issued what purported to be a final judgment declaring H.B. 830 to be unconstitutional, even though the defendants' time for filing their answer had not yet expired and they had never filed an answer in the action, nor had they been given a trial on the factual issues. The defendants appealed to this Court, and in our opinion in *Hellar I*, while we agreed that the trial court's interpretation of Art. III, § 5, of the Idaho Constitution prohibiting the joining of only portions of counties in legislative districts was correct and must be complied with in any apportionment of the Idaho legislature, we nevertheless acknowledged the denial of due process to the defendants, noting that:

> "At the time of the hearing of the preliminary injunction on May 17, 1982, the time for the defendants to file their answers to the plaintiffs' second amended complaint had not elapsed, and in fact no answers had been filed on behalf of any of the defendants. Accordingly, on remand, the defendants should be given the opportunity to file their answers asserting any defenses which they may have, and to submit additional evidence on the issue of the constitutionality of H.B. 830 if they deem it appropriate." *Hellar v. Cenarrusa*, 104 Idaho 858, 862, 664 P.2d 765, 769 (1983).

By our opinion in *Hellar I*, this Court recognized that due process requires that a litigant be given a trial, rather than be judged on *ex parte* affidavits.

After our opinion on remand in *Hellar I*, a trial was held, and the trial court not only held H.B. 830 to be unconstitutional, but prohibited the defendants and the Idaho legislature from conducting any election in 1984 under any other reapportionment plan except the court's Plan 14–B. Again on appeal, while this Court affirmed the trial court's finding that H.B. 830 was unconstitutional because it improperly divided counties under Art. III, § 5, of the Idaho Constitution, we nevertheless struck that portion of the trial court's judgment prohibiting the legislature from passing another reapportionment plan to be effective in 1984, on the obvious grounds that any order of a court which would purport to prohibit the Idaho legislature from carrying out its constitutional function of legislating would be an obvious violation of Art. 2, § 1 of the Idaho Constitution, which provides that, "The powers of the government of this state are divided into three distinct departments, the legislative, executive and judicial; and no person or collection of persons charged with the exercise of powers properly belonging to one of these departments shall exercise any powers properly belonging to either of the others, except as in this constitution expressly directed or permitted." Obviously prompted by our decision in *Hellar II* which struck the trial court's prohibition against the legislature attempting further reapportionment efforts, and pursuant to our admonition in that opinion in which we stated that "whenever a court declares an apportionment scheme unconstitutional, it is appropriate to afford a reasonable opportunity for the legislature to adopt a constitutional measure; and legislative bodies should assume that responsibility and not leave their apportionment task to the courts," the legislature struggled with the reapportionment issue throughout its regular 1984 session. Two reapportionment measures were passed by the legislature, only to be vetoed by the Governor. Finally, on Saturday, March 31, the last day of the regular 1984 legislative session, H.B. 746 AAS was passed by the legislature. On Monday, April 2, it was signed by the Governor. On the morning

of Monday, April 9, less than one week after it became law, it was struck down by this Court because it allegedly violated the equal protection clause of the fourteenth amendment of the United States Constitution. This Court, in its rush to preserve a perceived violation of these petitioners' equal protection rights under the fourteenth amendment, has trampled upon the due process rights of the defendants and the legislature, which are, ironically, guaranteed by that same fourteenth amendment to the United States Constitution.[2]

One of the basic requirements of due process is notice and the opportunity to be heard. *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950). The notice required before a judgment, which is to be accorded finality, is a notice reasonably calculated to apprise interested parties of the action and give them ample opportunity to present their objections. *Armstrong v. Manzo*, 380 U.S. 545, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965); *Milliken v. Meyer*, 311 U.S. 457, 61 S.Ct. 339, 85 L.Ed. 278 (1940). In this case, it is not even clear from this record if all interested parties received notice of the hearing, much less notice calculated to give them an opportunity to logically and coherently present their views. The purpose of notice "is to apprise the affected individual of, *and permit adequate preparation for,* an impending 'hearing'." *Memphis Light, Gas & Water Div'n v. Kraft*, 436 U.S. 1, 98 S.Ct. 1554, 1563, 56 L.Ed. 30 (1978) (emphasis supplied). It is clear that the litigants on the defendants' side were never afforded this basic due process right in this case.

The right to a hearing requires the right to be heard at a meaningful time and in a meaningful manner. *Fuentes v. Shevin*, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972); *see also Paratt v. Taylor*, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981). A hearing cannot be meaningful if the no-

tice and time allowed for preparation are inadequate and the right to present evidence or to conduct cross examination is totally denied. A hearing cannot be meaningful if one is not fully apprised of the facts asserted by the opposition, *Gonzales v. United States*, 348 U.S. 407, 75 S.Ct. 409, 99 L.Ed. 467 (1955), and allowed an opportunity to refute that evidence, especially where the case particularly turns upon factual issues. *Goldberg v. Kelly*, 397 U.S. 254, 96 S.Ct. 1011, 25 L.Ed.2d 287 (1970). The right to present evidence is essential to the fair hearing required by the due process clause. *Jenkins v. McKeithen*, 395 U.S. 411, 89 S.Ct. 1843, 23 L.Ed.2d 404 (1969).

The denial of due process rights is clear in this case. The majority correctly notes that a legislative reapportionment plan with a deviation of population greater than 10% "creates a prima facie case of discrimination and therefore *must be justified by the state.*" *Supra* at 542, (emphasis supplied). However, although the majority seemingly states the correct rule, it then totally denies the defendants the right to make that justification. This plan is declared a *prima facie* case of discrimination which, in the words of the majority, "must be justified by the state," *supra* at 542, but the "state" is never given the opportunity to so justify the plan. There has never been an evidentiary hearing on the justifications for H.B. 746. In making its hasty ruling, the majority ignores the express provision contained in *Hellar II* that once a legislative plan was signed into law we would appoint Judge Cogswell as a special master to allow the presentation of evidence on the plan, and allow the special master, as the *factfinder,* to develop findings of fact and conclusions of law to allow our review as an *appellate body,* and not as a trial court. Instead, the majority gave the defendants' counsel in *Hellar II* three

---

2. "§ 1. [Citizenship—Due process of law—Equal protection.]—All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the state wherein they reside. No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

days or less notice of an argument to this Court, at which hearing the Court assumed the truth of the petitioners' *ex parte* affidavits, the applicability and relevance of all of the evidence in *Hellar II,* and based its order and opinion on that record.

The majority acknowledges that the state asserts that the plan "can be justified because of Idaho's terrain, its shape, and its relatively sparse population." *Supra* at 542. However, the majority concludes that since both H.B. 746 and 14–B advance the policy of not dividing county lines, H.B. 746 is not necessary to preserve that policy. But the integrity of county lines was not the primary policy being urged by the defendants in support of H.B. 746; rather the defendants were asserting as justification the terrain, shape of the state, and sparse population. The majority cannot know if those stated policies are legitimately supported by H.B. 746, more so than 14–B, and enough so as to justify the deviation, because the defendants were never allowed to justify the plan in an evidentiary hearing. The majority assumes that the same objectives underlie all of these plans without allowing the defendants an opportunity to present their evidence concerning the objectives of H.B. 746.

The acts of the legislative branch of government (which have also received the concurrence of the executive branch in this case) are presumed to be constitutional, and, "A party who assails the constitutionality of a statute bears the burden of showing its invalidity and must overcome a strong presumption of validity." *Leliefeld v. Johnson,* 104 Idaho 357, 373, 659 P.2d 111, 127 (1983). Even if the petitioners have made a *prima facie* showing in their pleadings of a disparity in excess of 10%, the decisions of the United States Supreme Court provide that a state may justify that excessive disparity based upon an "acceptable state policy." " '*De minimis* deviations are unavoidable, but variations of 30% among senate districts and 40% among house districts can hardly be deemed *de minimis* and none of our cases suggests that differences of this magnitude will be accepted, without a satisfactory explana-

tion grounded on acceptable state policy.' " *Brown v. Thomson,* 462 U.S. 835, —, 103 S.Ct. 2690, 2696, 77 L.Ed.2d 214 (1983).

The state policy is established in part in certain findings set out in Section 1 of the bill:

"Be It Enacted by the Legislature of the State of Idaho:

"SECTION 1. STATEMENT OF LEGISLATIVE FINDINGS. The Legislature recognizes that many factors impact decisions regarding legislative apportionment. In adoption of the provisions of this act, the Legislature was cognizant that apportionment is fundamental to good government. In all decisions implemented in this act, certain principles governed. The most important of these was achievement of one person, one vote, as mandated by the federal constitution and interpretations by federal courts. In addition, recognition of county boundaries, creation of compact and contiguous districts, preservation of historical socioeconomic relationships, and recognition of natural topographical barriers weighed heavily upon these deliberations. The Legislature has been particularly aware of the requirements of Section 5, Article III, of the Constitution of the State of Idaho. The necessary balance between principles of the United States Constitution and guarantees of the Idaho Constitution has been placed squarely before the Idaho Legislature. The resulting apportionment, contained herein, is a balance of these and other special criteria, noted in this statement as applicable. "In certain districts, there exist such unique conditions, that deviation from the ideal of one person, one vote, seems not only warranted, but mandated. In Legislative District No. 1, composed of Bonner and Boundary Counties, these counties are bounded on three sides by other states and a foreign nation. No other combination of counties is possible which accomplishes representation of these populations. Similarly, Kootenai County, in Districts No. 2 and No. 3, has deviations from the ideal which may ex-

ceed the most desirable, but the county is given recognition through two districts entirely within its boundaries. Any combination with other counties would only serve to dilute the representation of Kootenai County as a separate and distinct unit.

"Benewah and Shoshone Counties are combined in a district without other counties based upon their traditional ties of economic and social interests.

"Four Legislative Districts, No. 5, No. 6, No. 7 and No. 8, illustrate legislative efforts to minimize deviations when it was possible without diluting representation. A floterial district concept is utilized in this area to achieve the representation to which the population total is entitled. The size of the floterial district is limited, however, to five counties, because inclusion of the ten counties north of the southern Idaho County boundary would create a district so large and cumbersome as to be difficult to represent. The diversity of interests thrown into a single district merely for the achievement of minimal deviation would then negate the legitimate representation of these interests.

"District No. 9, which is well below the ideal district size, nevertheless consists of four large and sparsely populated counties. While mathematical purity might be achieved by a combination of these and some northern counties, representation of like interests would be diluted.

"District No. 22 is well above the ideal district size, but represents a combination of counties very large in size, and without responsible alternatives. Bounded as it is by two states, Owyhee County with its sparsely populated expanse, warrants special consideration. Any combination of Owyhee County with another county than Elmore, would result in unnecessary and unwarranted dilution of the representation of the other county.

"District No. 23, composed of five counties of Butte, Clark, Custer, Jefferson and Lemhi, once again illustrates the problems of size and population density.

These counties have natural similarities of economic and social interests. They are bounded by another state on one side and by the natural topographical limitation of a large wilderness area and imposing mountain range on the other. While their interests are similar enough to be amenable to good representation, further division or other combinations would only dilute good representation.

"Use of two floterial districts in the southeastern corner of the state achieves better representation because the counties included are similar in their socioeconomic traditions. The size of the resulting districts is not excessive and the similarities of interests would make good representation a reasonable expectation. Further, floterial districts used here make it possible to represent individual counties, thereby maximizing county representation in the Legislature. Only through the use of a floterial district is Bingham County assured the representation to which its population would entitle it.

"While the concept of one person, one vote, has been preeminent in the accomplishment of this apportionment, another important factor has also been considered, and that is achievement of access to good representation. Each case of deviation from the ideal population size has been considered in light of the special circumstances which might warrant that deviation from the first principle, and the resulting enactment herein contained is a merger of these diverse interests and principles."

The majority ignores this stated policy and assumes that the real motive for the enactment of H.B. 746 was gerrymandering. The majority refers to "unrefuted" evidence of gerrymandering. Evidence will *always* necessarily be unrefuted when only one side is allowed the opportunity to submit its factual allegations at an appellate argument, while the other side is not allowed that opportunity. The majority relies upon innuendo of plaintiffs' counsel (that District 15 was "a fish" or "a sports

car heading out of town"), just as though reapportionment adjudication was some sort of judicial "Rorschack test." It is the purposes sought to be achieved by the legislature, not the resultant forms which the district boundaries assume, which should guide our consideration. The final decision should be based upon evidence presented at a trial, and not upon innuendo of counsel.

The majority also relies upon an affidavit of Susan Stacy, stating:

"The affidavit of Susan Stacy (Director of Planning and Community Development for the City of Boise) compares the division of Ada County under Plan 14–B and H.B. 746 and provides some of the factual basis of the gerrymandering charge. It is noteworthy that either by pure chance or by design the scheme of H.B. 746 does not put one incumbent legislator against another in either Ada, Canyon or Twin Falls counties, the three counties as to which evidence of gerrymandering was presented. The Stacy affidavit states:

'The H.B. 746 plan shows the typical characteristics of political gerrymandering: shoe string connections, odd-shaped long narrow districts, dispersion of urban populations into larger rural areas, and the unnecessary splitting of established neighborhoods.' " Supra at 543–544.

Neither the record in *Hellar I* nor in *Hellar II* support such a claim. The majority suggests that the legislature's motives were less than "pure" by noting that "H.B. 746 does not put one incumbent legislator against another" in support of its decision that gerry-mandering has occurred. On what "record" does the majority make that statement? The reapportionment trial conducted below concerned *only* H.B. 830, passed by the legislature in 1982. At the time of that trial, several legislators testified concerning their views of the motivations of the legislature in working on reapportionment. This included testimony by Vernon Brassey that at least the 1982 legislature used as one of its guiding principles the rule "don't run against an incum-

bent," *i.e.*, create districts in such a way as to prevent two incumbent legislators from having to run against each other. Other legislators, testifying about the 1982 legislature, referred to the pressures on the legislature to preserve the seats of incumbents. However, at the time those legislators testified, H.B. 746 was not even contemplated. *It did not even exist.* H.B. 746 was passed by an entirely different legislature, the 1984 legislature. Many of the legislators who testified at the trial on H.B. 830, including witness Brassey, were not even members of the 1984 legislature. No one from the 1984 legislature has ever been allowed to testify as to the concerns of that legislature in forming H.B. 746. H.B. 746 is being declared unconstitutional in part based upon allegations taken from a record generated in support of or in opposition to an entirely different bill, passed by an entirely different legislature.

The only other "record" cited to support the majority's gerry-mandering conclusion is the Stacy affidavit. It bears repeating that this conclusory affidavit was filed on Friday, April 6, 1984, the day of the hearing in this Court, and served on some counsel that day, and on others by mailing to them on Monday, April 9, 1984, the day that this Court entered its order holding H.B. 746 to be unconstitutional under the equal protection clause of the fourteenth amendment to the United States Constitution. For this Court to base its opinion on that affidavit denies these defendants the right to cross examine the declarant Susan Stacy; the right to counter her allegations; and the right to present evidence in support of the legislature's stated reasons for enacting H.B. 746.

This Court's rush to judgment does little to advance the fundamental goals of our judicial system—those of judicial order, of fundamental justice, and of basic fairness for *all* litigants. "The Constitution recognizes higher values than speed and efficiency." *Stanley v. Illinois,* 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972). The fourteenth amendment imposes upon the states requirements that "ensure that judicial procedures are fundamentally fair."

*Lassiter v. Dept. of Social Services,* 452 U.S. 18, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981).

If this Court does not rehear and reverse the precipitous action which it has taken in this case and give these defendants the procedural due process guaranteed them by the United States Constitution, then it would certainly be appropriate for them to commence an action in federal district court seeking injunctive and other relief under 42 U.S.C.A.1983, including perhaps damages, costs and attorney fees under 42 U.S.C.A. § 1988. *Supreme Court of Virginia v. Consumers Union of U.S.,* 446 U.S. 719, 100 S.Ct. 1967, 64 L.Ed.2d 641 (1980).

SHEPARD, Justice, dissenting.

I concur in the dissenting opinion of Bakes, J., released concurrently with this opinion. His comments on the shabby treatment afforded the defendants and the denial of due process inherent therein, together with the majority's stampede to judgment, need no reiteration here. Rather, I deal with the quantum leaps of the majority which are obviously designed to reach a foreordained result.

The history of legislative reapportionment in Idaho has been sufficiently set forth in *Hellar v. Cenarrusa II,* 106 Idaho 571, 682 P.2d 524 (Shepard, J., dissenting). It is sufficient at this juncture to point out two judicial milestones in the Idaho legislative reapportionment process. In the wake of and in response to *Hearne v. Smylie,* 378 U.S. 563, 84 S.Ct. 1917, 12 L.Ed.2d 1036 (1964), our legislature reapportioned and instituted legislative districts which divided certain counties. That apportionment scheme was tested in *Summers v. Cenarrusa,* 342 F.Supp. 288, 289 (1972). The Court said:

"It is our opinion that in order for the legislature to enact a practical reapportionment plan so as to comply with the requirements of the United States Constitution, it *could not* and *was not required* to comply with the Idaho Constitutional prohibition against dividing

counties." 342 F.Supp. at 290. (Emphasis supplied.)

That language is clear, concise and inescapable, and whether or not that holding is binding upon the Idaho state courts, it was relied upon by the Idaho legislature in continuing its legislative reapportionment scheme. Following the institution of the instant action, this Court in *Hellar v. Cenarrusa I* directed an evidentiary hearing on the constitutionality of the then existing reapportionment scheme (H.B. 830) and on the ability to devise a plan which satisfied the mandates of both the federal constitution, as to maximum deviation, and the state constitution, as to the splitting of counties. Upon review of the trial court's decision, this Court in *Hellar v. Cenarrusa II* held that H.B. 830 was unconstitutional (which holding was in direct conflict with the previous federal court decision) and permitted the Idaho legislature the opportunity to enact a new scheme of legislative apportionment. In that decision this Court clearly stated:

"Nevertheless, supposing the proper statistical method yielded a population deviation of 41.3%, given Idaho's state constitutional mandate, and its particular circumstances (geographic, economic, social and others), *that percentage would still pass muster under federal constitutional standards in view of the decisions of the United States Supreme Court.*"

The 1984 session of the Idaho legislature clearly relied and acted upon that specific above quoted language of the Court as it struggled through the 1984 session. It enacted several different plans, none of which gained both legislative and executive approval. Finally, in what was obviously a bipartisan effort, H.B. 746 received overwhelming legislative approval and the approval of the Governor.

This Court, in its cavalier treatment of the legislative and executive branches of government, strikes down H.B. 746 on the basis that a deviation of some 32% is violative of the federal constitution and its explicit statements and implicit conclusions

that the 1984 legislature engaged in "political gerrymandering" and "partisan gerrymandering."

There is not a scintilla of evidence to support either the factual assertions of the majority or its inferred conclusions. This Court in *Hellar v. Cenarrusa II* told the legislature to come in with a reapportionment plan which had a population deviation of less than 41.3%, although the dissent thereto specifically pointed out the dangers of that language. The legislature did exactly as it was directed by this Court and, if fault there is, it should be shouldered by this Court rather than the Court being critical of the legislature.

The Court insults the legislature when the Court refuses to even mention the legislative statement of purpose for H.B. 746 which sets forth in detail the considerations given to the H.B. 746 reapportionment scheme which led to its enactment and presumably to the gubernatorial approval. Instead, like a flea on a hot griddle, it quantum leaps from one conclusion to another to reach its fore-ordained result.

The majority condemns H.B. 746 as "tainted," as not providing "coherent districts," but rather providing "stretched districts." I suggest that the myopic view of the majority ignores the factual existence of the State of Idaho. More than 70% of Idaho's land area is owned by the federal or state governments. Those enormous land areas include national forests, national monuments, lands controlled by the Bureau of Land Management, wilderness areas, and others in which the population is negligible. Thus, most of our population is scattered throughout 30% of our land area. In some of the remaining land area, population is extremely sparse, with some of our counties having less than 1,000 people. Some of our counties contain land area large enough to accommodate several New England states and yet their population is relatively sparse. Given these factors alone, Idaho's legislative apportionment will at times necessarily require districts of unusual shape and "stretching" if any consideration is to be given the mandate of

one-man, one-vote. No comparison can be drawn to a small state with a uniform compact density of population which may allow legislative districts comprised of neat squares or rectangles. The wondrous diversity and perversity of Idaho allows no such comparison.

Even within a relatively compact area with substantial population such as Ada County, there is substantial agricultural property with relatively sparse population. People do not reside in public parks, governmental malls, business districts, streets and highways, airports, and other types of areas. District lines must accommodate the existence of pockets and distributions of population.

There is absolutely nothing alleged or in the record before us to suggest "gerrymandering" for the purpose of diluting the voting strength of a racial or otherwise suspect category. The majority further criticizes H.B. 746 as mixing urban and rural populations. No authority is cited therefor and I know of no decisions that condemn such a practice when it is necessary, as in the case of Idaho, to obtain the best possible accommodation to the principle of one-man, one-vote. The majority's criticism of H.B. 746 for its "stretched" districting can only be considered ludicrous in light of the Court's approved plan which contains a district "stretching" some 225 miles in length and 100 miles in width.

In short, there is simply no factual basis for the majority's assertions that the legislature has acted in derogation of its duties. H.B. 746 is presumed constitutional. The only rebuttal to that presumption is so-called "evidence" presented by affidavit and adopted by the majority, since any contrary "evidence" was not permitted. It is unseemly that this Court should adopt such a paranoid attitude toward legislative attempts to reapportion and its own dogmatic and dictatorial adoption of Plan 14–B.

The majority doggedly insists that the 1984 legislative elections shall be conducted under Plan 14–B. Defendants in the action, four days ago, filed a motion for stay of the Court's previous order pointing out

by way of the chief election official for the State of Idaho the difficulties and perhaps impossibility of holding the elections as ordered under Plan 14–B. As of the time of the issuance of the majority opinion, the Court had not considered that motion for stay nor acted upon it. The motion for stay points out at least one overriding difficulty. As of 5:00 p.m. today, April 16, the date for filing candidacies for legislative office, is closed. The Secretary of State is required to certify to the legislative district central committee of each party those legislative positions for which a filing has been made. I.C. § 34–706. Thereafter, the legislative district central committee of each party may appoint and certify to the Secretary of State candidates for those positions which would otherwise remain vacant on the ballot. I.C. § 34–714. Clearly, there are no such legislative district committees for legislative districts formed by Plan 14–B, and hence there is no entity to which the Secretary of State can certify vacancies in accordance with the statute nor whom can appoint to fill those vacancies. *See* I.C. § 34–503.

This factor is only one which, in my opinion, makes an election conducted under Plan 14–B next to, if not totally, impossible. Nevertheless, the majority continues its headlong rush to the implementation of. Plan 14–B, which, in my opinion, will deprive a substantial number of people in the State of Idaho the opportunity to participate in a republican form of government as guaranteed by our constitution.

In my opinion, since this Court has exercised its naked power of judicial fiat, it should now halt and reconsider. It should halt the entire electoral process and, at worst, require the 1984 legislative electoral process be conducted in accordance with H.B. 746 and require the next 1985 legislature to reapportion itself. In the meantime, the Court should, by equal judicial fiat, establish a new date for the filing of candidacy, a new date for the closing of that filing, and a primary election to be held in the fall. Admittedly, such a procedure is neither the most desirable or best, but it has the virtue of providing for a republican form of government by mean-

ingful elections and extracting the state from the imbroglio in which it now finds itself.

HUNTLEY, Justice, responding to the dissents.

The dissents have grossly misstated the record and are totally in error in suggesting that any litigants before this Court were not given full due process.

I briefly document here several of the more salient of numerous examples of misstatement, but first I invite the attention of any lawyer or legislator worth his salt to one missing element in either dissent—citation to one single decision of the United States Supreme Court which would permit us to declare the population deviation of H.B. 746 of 32.9% as being constitutional. The dissents cite none because there are none. Thus they most carefully avoid addressing the merits of the only issue before us—the constitutionality of H.B. 746.

The public is entitled to know the truth about the charges leveled in the dissents.

### I.

## OPPORTUNITY FOR FULL TRIAL AND PRESENTATION OF EVIDENCE

*The Charge:*

The dissents assert that this Court has refused to provide the defendants with a trial and opportunity to put on evidence.

*The True Facts:*

(1) On March 30th this Court conducted a pre-hearing conference at which the various defendants were represented by four attorneys. The main purpose was to inquire of the attorneys whether they desired to (a) submit the case on the record, or (b) present evidence either directly to this Court or to a special master—all four opted to submit the case on the record.

(2) At the final hearing in Lewiston, the supporters of H.B. 746 were represented by five attorneys. Not one attorney requested an extension of time or requested opportunity to present either live testimony or further affidavits or exhibits.

(3) To this day not one attorney for either side (eight attorneys appeared in Lewiston) has urged that his clients were not afforded due process—such suggestion comes only from the dissenters.

For members of this Court, who have not interviewed a single potential witness, to suggest that defense counsel misrepresented their clients by not asking leave to present live testimony, is to step outside the realm of either our knowledge, our expertise, or our proper function.

## II.

## THE USE OF EX PARTE AFFIDAVITS

*The Charge:*

The dissents assert this case was decided on *ex parte* affidavits.

*The True Facts:*

For openers, there were no *ex parte* affidavits. "Ex parte" refers to a communication by one party to the Court without the knowledge of the other parties. Every affidavit was submitted to the opposing counsel and most of them were referred to in oral argument on April 6th. The suggestion that counsel actually representing the parties did not have the affidavits before the hearing is simply not correct.

Secondly, the determinative issue of the case, i.e., the constitutionality of the population deviation of 32.9% in H.B. 746, did not depend on any of the affidavits, (except for the fact stipulated to by both sides, that the deviation was indeed 32.9%.) The fact of a 32.9% deviation, in light of the presence in the record of ten plans with less than 10% deviation, required and compelled a ruling of unconstitutionality under the controlling United States Supreme Court decisions.

## III.

## DUE PROCESS AND NOTICE OF HEARING

*The Charge:*

The dissenters state:

"In this case, it is not even clear from this record if all parties received notice of the hearing, much less notice calculated to give them an opportunity to logically and coherently present their views."

*The True Fact:*

All parties had attorneys present at the hearing—one questions how they happened to appear in court if they had no notice.

As to the matter of having opportunity to logically and coherently present their views—no attorney requested more time; only the dissenters in this case assert, of their own volition that there was inadequate notice.

## IV.

## DUE PROCESS AND A TRIAL

*The Charge:*

"By our opinion in *Hellar I*, this Court recognized that due process requires that a litigant be given a trial."

*The True Fact:*

Would any legislator, party, or other citizen who may be enticed by that one please ask his personal attorney to explain Rule 56 of the Idaho Rules of Civil Procedure?

Every state and federal trial court in the nation has a procedure whereby the parties may elect to submit a case on pleadings, affidavits, and the record of prior proceedings. The dissent is seeking to second guess defense trial counsel—this court did not refuse a single request for hearing, further discovery, or trial.

## V.

## THE PRIOR IDAHO FEDERAL COURT DECISIONS AND LEGISLATIVE RELIANCE

*The Charge:*

The dissent of Justice Shepard asserts that:

"Upon review of the trial court's decision, this Court in *Hellar v. Cenarrusa II* held that H.B. 830 was unconstitutional (*which holding was in direct conflict with the previous federal court decision*). (Emphasis supplied).

*The True Fact:*

In the two previous federal court cases, no party presented a plan to the court which met the mandates of both constitutions—in fact they represented to the Court that such was impossible. The early federal court decisions stood only for the proposition that *if* honoring county lines is impossible or unfeasible, then in that event the equal representation clause of the federal constitution prevails.

*The Charge:*

That the legislature clearly relied on the 41.5% language of *Hellar II.*

*The True Fact:*

(1) The language is taken out of context and misapplied as explained at page 6 of the Majority Opinion herein.

(2) Newspaper accounts of reapportionment work throughout the session demonstrate the legislators received warnings of problems which might be presented by plans with large deviations.

(3) At the March 30 prehearing conference before this Court (at which numerous legislators and their attorneys were present) and which date was prior to final passage of H.B. 746 and adjournment, warning issued publicly from the bench that the Court knew of no federal court decisions which would countenance the 32.9% deviation under the circumstance of plans under 10% being available.

(4) The Governor, upon signing H.B. 746, expressed that he and his counselors had grave doubts about its constitutionality.

## VI.

### SUE THE MAJORITY

The suggestion by the dissent that the defendants should bring a civil rights action against the majority of this Court is certainly novel, a disingenuous attempt at intimidation, and might be thought by some to indicate a lack of even a modicum of judicial approach and detachment.

\*   \*   \*   \*   \*   \*

Did anyone ever believe that either legislators or jurists could maintain decorum and a sense of humor while undergoing reapportionment proceedings?